STATE of Minnesota, by Stephen W. COOPER, Commissioner, Department of Human Rights, Respondent,

v.

**Layle FRENCH, Petitioner, Appellant.**

**No. C2-89-1064.**

Supreme Court of Minnesota.

Aug. 31, 1990.

Rehearing Denied Oct. 8, 1990.

---

James R. Anderson, Marshall, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Andrea Mitau Kircher, Carl M. Warren, Earll M. Pott, Sp. Asst. Attys. Gen., St. Paul, for respondent.

YETKA, Justice.

Appellant was found guilty of discrimination by an administrative law judge to whom a complaint filed with the Department of Human Rights was referred for hearing. Appellant had refused to rent his property to one Susan Parsons because she planned to live there with her fiancé. A trial de novo before the district court was denied, and the court of appeals affirmed the action of the administrative law judge. French was ordered to pay $368.50 in compensatory damages to Parsons, $400 for mental anguish and suffering, and $300 civil penalties. We reverse the administrative law judge and the court of appeals.

A summary of the facts are as follows:

French owned and occupied a two-bedroom house ("subject property") in Marshall, Minnesota, until moving to a house he purchased in the country. While attempting to sell the subject property, French rented it to both single individuals and married couples. From January to March 1988, French advertised the subject property as being available for rent. On February 22, 1988, French agreed to rent the property to Parsons and accepted a $250 check as a security deposit.

Shortly thereafter, French decided that Parsons had a romantic relationship with her fiancé, Wesley Jenson, and that the two would likely engage in sexual relations outside of marriage on the subject property. On February 24, 1988, French told Parsons that he had changed his mind and would not rent the property to her because unmarried adults of the opposite sex living together were inconsistent with his religious beliefs. French is a member of the Evangelical Free Church in Marshall, and his beliefs include that an unmarried couple

living together or having sexual relations outside of marriage is sinful. Despite being questioned by French, neither Parsons nor Jenson told French whether they were planning to have sexual relations on the subject property. The record is in dispute as to whether appellant had knowledge of Parsons' intended sexual activity with her fiancé, but Parsons did not deny such an intent when queried by French. Even if they would not have had sexual relations on the property, French believes that living together constitutes the "appearance of evil" and would not have rented to them on that basis. French admits that if Parsons had been married to Jenson, he would not have objected renting to them.

Parsons filed a charge of discrimination against French with respondent department alleging that French committed marital status discrimination in violation of the Minnesota Human Rights Act (MHRA) when he refused to rent the subject property to her because she planned to live there with her fiancé. Following an investigation, the department issued a complaint against French.

An administrative law judge granted the department partial summary judgment on the issue of liability, ruling that French violated the act's (Minn.Stat. § 363.03, subd. 2(1)(a) (1986)) prohibition of marital status discrimination by refusing to rent the subject property to Parsons because she was single and living with her fiancé and rejected French's defenses. Following a hearing on damages, the judge found French liable to Parsons for $368.50 in compensatory damages and $400.00 in mental anguish and suffering. In addition, the judge assessed a civil penalty of $300 to be paid to the State of Minnesota by French, but declined to award punitive damages. French's motion for a trial de novo in district court was denied.

After issuing French a writ of certiorari, a court of appeals panel affirmed that French discriminated against Parsons because of her marital status in violation of

the Human Rights Act and that neither the free exercise of religion nor any of French's other arguments provided a defense. We granted French's petition for further review.

■ On an appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact and (2) whether the lower courts erred in their application of the law. *Offerdahl v. University of Minn. Hosp. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988).

■ Initially, the department must establish a prima facie case of discrimination. *State ex rel. McClure v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 849 (Minn. 1985), *appeal dismissed,* 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986). We must examine whether appellant's refusal to rent to Parsons constituted a prima facie violation of the Human Rights Act's prohibition of marital status discrimination. The act provides in relevant part:

It is an unfair discriminatory practice:

(1) For an owner, lessee * * *

(a) to refuse to sell, rent, or lease * * * any real property because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, or familial status.

Minn.Stat. § 363.03, subd. 2. As applied to this case, French was the owner and lessee of the subject property, and Parsons attempted to rent the property from him.

I. *The Definition of "Marital Status"*

The administrative law judge (ALJ) found that appellant refused to rent to Parsons because she "was single *and* planned to cohabit[1] *with another person of the opposite sex."* The version of the MHRA in effect at the time the alleged discrimination occurred and when the charge was filed did not contain a definition of the term "marital status."[2] *See* Minn.Stat. § 363.01 (1987 Supp.).

---

1. "Cohabit" means to live together in a sexual relationship when not legally married. *The American Heritage Dictionary of the English Language* 259 (1980) (New College Dictionary).

2. In 1988, the legislature amended the MHRA for the purpose of "clarifying the definition of marital status discrimination." Act of Apr. 26, 1988, ch. 660, § 1, 1988 Minn.Laws 917, 918

■ It is well settled that, in the interpretation of ambiguous statutes, this court is required to discover and effectuate legislative intent. *State on Behalf of Forslund v. Bronson,* 305 N.W.2d 748, 751 (Minn. 1981). The term "marital status" is ambiguous because it is susceptible to more than one meaning, namely, a meaning which includes cohabiting couples and one which does not. *Mister v. A.R.K. Partnership,* 197 Ill.App.3d 105, 143 Ill.Dec. 166, 170, 553 N.E.2d 1152, 1156 (1990); *see* Alley, *Marital Status Discrimination: An Amorphous Prohibition,* 54 Fla.B.J. 217 (1980), *cited with approval in Cybyske v. Independent School Dist. No. 196,* 347 N.W.2d 256, 261 n. 4 (Minn.1984). In order to show that construing "marital status" to include unmarried cohabiting couples is inconsistent with public policy, legislative intent, and previous decisions of this court, it is necessary to examine the history of the MHRA and our cases interpreting it.

The MHRA was amended in 1973 to add the prohibition against discrimination on the basis of "marital status." Act of May 24, 1973, ch. 729, § 3, 1973 Minn.Laws 2158, 2162 (codified at Minn.Stat. § 363.03, subd. 2 (1988)). This court, in construing the term "marital status" has consistently looked to the legislature's policy of discouraging the practice of fornication and protecting the institution of marriage. *See Kraft, Inc. v. State ex rel. Wilson,* 284 N.W.2d 386, 388 (Minn.1979) (8–0 decision). *Kraft* presented the question of whether an employer's anti-nepotism policy constituted marital status discrimination within the meaning of the MHRA. *Id.* at 387–88. In answering this question in the affirmative, Chief Justice Sheran stated:

> Endorsing a narrow definition of marital status and uncritically upholding an employment policy such as respondent's *could discourage similarly situated employees from marrying.* In a locale where a predominant employer enforced such a policy, economic pressures might lead two similarly situated individuals to forsake the marital union and *live to-*

> *gether in violation of Minn.Stat. § 609.34* [fornication statute]. Such an employment policy would thus undermine the *preferred status enjoyed by the institution of marriage.*

> *In view of these considerations,* we hold the employment policy of respondent presumptively invalid under Minn. Stat. § 363.03, subd. 1.

*Kraft,* 284 N.W.2d at 388 (emphasis added) (footnote omitted). The *Kraft* court unanimously concluded that the fornication statute was a valid expression of Minnesota public policy. Moreover, the *Kraft* court did not ignore the destructive practical effect of a contrary ruling simply because there was no direct evidence of fornication. It is easy to see that, but for these important public policies, the *Kraft* decision would have been different.

The respondent cites *State ex rel. McClure v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 849–50 (Minn.1985), as binding precedent as to the definition of "marital status" in the context of cohabitation. A careful reading of *Sports & Health Club,* however, reveals that this reliance is misplaced. In *Sports & Health Club,* this court said:

> Justice Peterson, in dissent, argues that the discrimination claim predicated upon questioning of employees and applicants on cohabitation of unmarried persons is not a ground under the statute for finding discrimination. *Even though we agree with his contention,* yet the record appears clear to us that Sports and Health went far beyond permissible bounds in questioning employees and applicants in areas clearly prohibited by the act.

*Id.* at 850 n. 10 (emphasis added). The contention the *Sports & Health Club* majority was agreeing with was Justice Peterson's observation that the hearing examiner acknowledged "a clear inference of sexual relations between cohabiting couples" and his conclusion that "[i]t is preposterous to impose sanctions upon an employer, par-

(codified at Minn.Stat. § 363.01, subd. 40 (1988)). This definition, however, does not apply in the instant case because it did not become

effective until August 1, 1988. *See* Minn.Stat. § 645.02 (1988); *see also* Minn.Stat. § 645.21 (1988) (presumption against retroactive effect).

ticularly this employer, who refused to employ persons whose conduct constitutes criminal misbehavior." *Id.* at 872 (Peterson, J., dissenting). Thus, the *Sports & Health Club* court unanimously agreed that direct evidence of fornication is not necessary and that unequal treatment based on cohabitation was not "marital status" discrimination. Accordingly, if respondent truly feels "obliged to follow clear established precedent," it must conclude that there was no marital status discrimination in the present case.

Respondent makes the surprising suggestion that the fornication statute no longer expresses this state's public policy because "it has fallen into complete disuse." Not only is such a notion of implied repeal unprecedented, it is factually mistaken. *See State v. Ford,* 397 N.W.2d 875 (Minn. 1986). In *Ford,* an educator was charged with fornication in connection with consensual sex acts with 16–year–old students. *Id.* at 876–77. Although the educator entered into a plea bargain agreement pursuant to which he pleaded guilty to different charges, there was no suggestion by anyone that the fornication statute was a nullity.

The *Kraft* approach of defining the scope of the term "marital status" in light of legislative intent was followed in *Cybyske v. Independent School Dist. No. 196,* 347 N.W.2d 256 (Minn.1984) (5–2 decision). In *Cybyske,* however, this court declined to extend the definition of "marital status" discrimination to encompass distinctions by an employer based on the conduct of a prospective employee's spouse. *See id.* at 261. In reaching this conclusion, this court stated:

> The legislature did not intend to proscribe a particular political posture, whether of an employee or of the employee's spouse, in the Human Rights Act. *Nor do we think the term marital status should be construed to include what the legislature excluded.* Here the alleged immediate reason for the discrimination is not directed at the institution of marriage itself.

*Id.* (emphasis added). Read together, *Kraft, Cybyske,* and *Sports & Health Club* stand for the proposition that, *absent express legislative guidance,* the term "marital status" will not be construed in a manner inconsistent with this state's policy against fornication and in favor of the institution of marriage.

The legislative response to the *Cybyske* decision also demonstrates that the legislature did not intend to expand the definition of "marital status" in order to penalize landlords for refusing to rent to unmarried, cohabiting couples. Minn.Stat. § 363.01, subd. 40 (1988) defines "marital status" as follows:

> "Marital status" means whether *a person* is single, married, remarried, divorced, separated, or a surviving spouse *and, in employment cases,* includes protection against discrimination on the basis of the identity, situation, actions, or beliefs of a spouse or former spouse.

(Emphasis added.) The plain language of this new definition shows that, in non-employment cases, the legislature intended to address only the status of an *individual,* not an individual's relationship with a spouse, fiancé, fiancée, or other domestic partner. The extremely broad language following the phrase "and, in employment cases" constitutes legislative recognition that employment cases are fundamentally different from housing cases such as the case at bar.

The legislative history of this subdivision indicates that the legislature did not intend to extend the protection of the MHRA to unmarried, cohabiting couples in the area of housing. In a legislative hearing on a bill for an act to clarify the definition of "marital status," State Human Rights Commissioner Cooper explained the bill as being a response to the *Cybyske* case. *See* Hearing on H.F. 2054, H. Civil Law Subcomm. of Jud. Comm., 75th Minn.Leg., Feb. 26, 1988 (audio tape). Representative Quist, objecting to the broad language of the bill, referred to a hypothetical scenario in which a landlord would be forced to rent to a person whose spouse was a polygamist. *Id.* Representative Quist indicated that employment and housing were differ-

ent situations and that the bill's language was much too broad, at least as to housing. *Id.* Commissioner Cooper stated that he would reconsider the impact of the bill in the housing area and report back to the subcommittee. *Id.* At the next hearing on the bill, an amendment to the bill was offered that confined the extremely broad language to employment cases only. Hearing on H.F. 2054, H. Civil Law Subcomm. of Jud. Comm., 75th Minn.Leg., Feb. 26, 1988 (audio tape). The amendment limiting the broad definition of "marital status" to employment cases was ultimately enacted into law. Finally, it is worth noting that subsequent attempts to expand the definition of marital status also failed. For example, at one point, the proposed definition included "single, married, divorced, widowed, separated, *or other like status* * * *. *See* 4 Journal of the House of Representatives 8696 (75th Minn.Leg., Mar. 14, 1988). This "or other like status" did not survive in the final bill.

It is obvious that the legislature did not intend to extend the protection of the MHRA to include unmarried, cohabiting couples in housing cases. It is the duty of this court to follow *Cybyske* and decline to construe the term "marital status" "to include what the legislature excluded." *See Cybyske*, 347 N.W.2d at 261.

Other courts which have addressed the same issue have considered their state's policy with respect to fornication as expressed in statutory law. *See Foreman v. Anchorage Equal Rights Comm'n*, 779 P.2d 1199, 1201–02 (Alaska 1989); *Mister v. A.R.K. Partnership*, 197 Ill.App.3d 105, 113–14, 143 Ill.Dec. 166, 171, 553 N.E.2d 1152, 1157 (1990). The facts in *Mister* were virtually identical to the instant case except the record was silent as to the defendants' alleged religious beliefs. *See Mister*, 197 Ill.App.3d at 107–10, 143 Ill. Dec. at 167–68, 553 N.E.2d at 1153–54 (1990). In *Mister*, the court held that the Illinois Human Rights Act's prohibition against discrimination on the basis of sex or marital status [3] does not include a land-

lord's refusal to rent an apartment to unmarried persons of the opposite sex. *Mister*, 197 Ill.App.3d at 116–17, 143 Ill.Dec. at 173, 553 N.E.2d at 1159. In ascertaining legislative intent, the court observed that:

Plaintiffs' interpretation of the Act would have us conclude that the legislature intended to protect from discrimination those individuals who choose to cohabit with a person of the opposite sex without entering into marriage. The fornication statute, as it existed when plaintiffs attempted to rent the apartments, evidenced this State's policy against such a practice. We believe plaintiffs' interpretation of the Act is in conflict with the longstanding policy reflected by the fornication statute. Statutory provisions relating to the same subject matter should be construed harmoniously where possible. * * *

Such a stance [by this court] expresses neither approval nor disapproval of discreet cohabitation; couples who wish to live together without being married can certainly still do so, *but they must find a landlord who does not object to the arrangement. The Act's failure to protect such couples from "discrimination" merely evidences the legislature's hesitancy to require landlords to acquiesce.*

197 Ill.App.3d at 114–15, 143 Ill.Dec. at 171–72, 553 N.E.2d at 1157–58 (emphasis added).

Similarly, in *Foreman*, the Alaska Supreme Court, in ascertaining its legislature's intent as to the meaning of "marital status," relied entirely on the fact that Alaska's fornication statute had been repealed 11 years earlier in concluding that protection for unmarried, cohabiting couples was included. *Foreman v. Anchorage Equal Rights Comm'n*, 779 P.2d at 1201–02. At the very least, before the state imposes sanctions on French, it must repeal the fornication statute.

Respondent cites *Sports & Health Club* in support of its argument that French gave up his constitutional rights "by enter-

**3.** Illinois law defined "marital status" as "the legal status of being married, single, separated, divorced or widowed." Ill.Rev.Stat. ch. 68, ¶ 1–103(J) (1987).

ing the public marketplace." As outlined above, employment cases are distinguishable from housing cases. In addition, the *Sports & Health Club* court made it clear that the discrimination in that case was "pernicious" because it was practiced by a Minnesota business corporation engaged in business for profit and the discrimination was irrelevant to "the main decision of competence to perform the work." *Sports & Health Club*, 370 N.W.2d at 853.

It is one thing to prohibit an entity which has availed itself of the privilege of doing business for profit in the corporate form from denying Minnesota residents the basic right to earn a living. An employer is entitled to less control over what an employee does away from the place of employment, but, here, French was renting his former residence while it was for sale in a depressed real estate market. It is unreasonably cynical to say that his choice is simple: that he need not rent at all. Economic necessity may require him to seek rental income and this may be as critical to him as the need for wage income underlying the *Sports & Health Club* decision.[4] On the other hand, what burden is imposed on Parsons to enable her to rent, but not live with her fiancé on the premises?

It is simply astonishing to me that the argument is made that the legislature intended to protect fornication and promote a lifestyle which corrodes the institutions which have sustained our civilization, namely, marriage and family life. If the legislature intended to protect cohabiting couples and other types of domestic partners, it would have said so. The legislative history of this statute indicates that an attempt to do this was defeated by a substantial majority of the Minnesota House of Representatives. It is not the role of this court, especially in light of the foregoing analysis, to read such protections into the MHRA.

II. *Minnesota Constitution*

■ Although, in arguments to this court, appellant emphasized the United

States Constitution, the issue of protection of religious liberty under the Minnesota Constitution was properly preserved for appeal. In light of the unforeseeable changes in established first amendment law set forth in recent decisions of the United States Supreme Court, justice demands that we analyze the present case in light of the protections found in the Minnesota Constitution. *See Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. ——, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Minnesota v. Hershberger*, —— U.S. ——, 110 S.Ct. 1918, 109 L.Ed.2d 282 (1990) (vacating this court's judgment in *State v. Hershberger*, 444 N.W.2d 282 (Minn.1989) and remanding the case for further consideration).

As we said in *State v. Fuller*, 374 N.W.2d 722 (Minn.1985):

It is axiomatic that a state supreme court may interpret its own constitution to offer greater protection of individual rights than does the federal constitution. *Indeed, as the highest court of this state, we are "independently responsible for safeguarding the rights of [our] citizens."* State courts are, and should be, the first line of defense for individual liberties within the federalist system.

*Id.* at 726 (emphasis added) (citations omitted). The people of the State of Minnesota have always cherished religious liberty. The Preamble to the Constitution of the State of Minnesota provides:

We, the people of the state of Minnesota, grateful to God for our civil *and religious liberty*, and desiring to perpetuate its blessings and secure the same to ourselves and our posterity, do ordain and establish this Constitution.

(Emphasis added.) The Minnesota Constitution, unlike the United States Constitution, treats religious liberty as more important than the formation of government. *See* Preamble, U.S. Const. ("[I]n order to form a more perfect union * * *.").

4. The administrative law judge found that French had a net income of $3,851 in 1986, $5,481 in 1987, and $6,470 in 1988.

The pertinent language in the Minnesota Constitution addressing religious liberty is as follows:

> The right of every man to worship God according to the dictates of his own conscience shall never be infringed * * * *nor shall any control of or interference with the rights of conscience be permitted,* or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state * *. *.

Minn. Const. art. I, § 16 (emphasis added). The plain language of this section commands this court to weigh the competing interests at stake whenever rights of conscience are burdened. Under this section, the state may interfere with the rights of conscience only if it can show that the religious practice in question is "licentious" or "inconsistent with the peace or safety of the state." In the present case, the state has simply failed to make such a showing. Moreover, the state contends that it has a compelling interest in protecting licentious practices which is sufficient to override French's religious freedom.

The broad protection of religious liberty required by the Minnesota Constitution is not surprising given the background of the people who adopted this constitution. This special history, shared by the people who adopted the Minnesota Constitution, was eloquently described by the Wisconsin Supreme Court as follows:

> The early settlers of Wisconsin came chiefly from New England and the Middle States. They represented the best religious, intellectual, and moral culture, and the business enterprise and sagacity, of the people of the states from whence they came. They found here a territory possessing all the elements essential to the development of a great state. They were intensely desirous that the future state should be settled and developed as rapidly as possible. They chose from their number wise, sagacious, Christian men, imbued with the sentiments common to all, to frame their constitution.

> The convention assembled at a time when immigration had become very large and was constantly increasing. The immigrants came from nearly all the countries of Europe, but most largely from Germany and Ireland. As a class, they were industrious, intelligent, honest, and thrifty—just the material for the development of a new state. Besides, they brought with them, collectively, much wealth. They were also religious and sectarian. Among them were Catholics, Jews, and adherents of many Protestant sects. These immigrants were cordially welcomed, and it is manifest the convention framed the constitution with reference to attracting them to Wisconsin. Many, perhaps most, of these immigrants came from countries in which a state religion was maintained and enforced, while some of them were non-conformists and had suffered under the disabilities resulting from their rejection of the established religion. * * * Such were the circumstances surrounding the convention which framed the constitution. In the light of them, *and with a lively appreciation by its members of the horrors of sectarian intolerance and the priceless value of perfect religious and sectarian freedom and equality, is it unreasonable to say that sectarian instruction was thus excluded * * *?*

*State ex rel. Weiss v. District Bd. of School Dist. No. Eight,* 76 Wis. 177, 197–98, 44 N.W. 967, 974–75 (1890) (emphasis added).

In view of the above considerations and the history our state shares with the State of Wisconsin, we are compelled to conclude that French must be granted an exemption from the MHRA unless the state can demonstrate compelling and overriding state interest, not only in the state's general statutory purpose, but in refusing to grant an exemption to French.

In short, we interpret the Minnesota Constitution as requiring a more stringent burden on the state; it grants far more protection of religious freedom than the broad language of the United States Constitution.

Pursuant to this analysis, we conclude that the state has failed to sustain its burden in demonstrating a sufficiently compelling interest.

It appears that we have now reached the stage in Minnesota constitutional law where the religious views of a probable majority of the Minnesota citizens are being alleged by a state agency to violate state law. Today we have a department of state government proposing that, while French has sincere religious beliefs and those beliefs are being infringed upon by the Human Rights Act, the state, nevertheless, has an interest in promoting access to housing for cohabiting couples which overrides French's right to exercise his religion.

Respondent characterizes the state's interest as "eliminating *pernicious* discrimination, including marital status discrimination." We are not told what is so pernicious about refusing to treat unmarried, cohabiting couples as if they were legally married. The state does not even attempt to reconcile this notion with this court's express recognition of the "preferred status" of the institution of marriage in *Kraft.* The court in *Mister* offered the following analysis of the Illinois Supreme Court on this point:

> There are major public policy questions involved in determining whether, under what circumstances, and to what extent it is desirable to accord some type of legal status to claims arising from such relationships. Of substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage. Will the fact that legal rights closely resembling those arising from conventional marriages can be acquired by those who deliberately choose to enter into what have heretofore been commonly referred to as "illicit" or "meretricious" relationships encourage forma-

tion of such relationships and weaken marriage as the foundation of our family-based society?

*Mister,* 197 Ill.App.3d at 114–16, 143 Ill. Dec. at 172, 553 N.E.2d at 1158 (quoting *Hewitt v. Hewitt,* 77 Ill.2d 49, 58, 31 Ill. Dec. 827, 830, 394 N.E.2d 1204, 1207 (1979)). There are numerous other contexts in which cohabiting couples are not legally entitled to the same treatment as married couples. A prime example is found in the area of employee life and health insurance benefits, a subject which is also regulated by the MHRA. *See* Minn. Stat. § 363.03, subd. 1(2)(c) (1989 Supp.). Other examples are found in the laws governing intestate succession and the rules of evidence governing the privilege for marital communications. Is the argument now being made that these too are *"pernicious"* discrimination? If they are, surely it is the role of the legislature to make whatever changes are necessary.

How can there be a compelling state interest in promoting fornication when there is a state statute on the books prohibiting it? *See* Minn.Stat. § 609.34 (1988). Moreover, if the state has a duty to enforce a statute in the least restrictive way to accommodate religious beliefs, surely it is less restrictive to require Parsons to abide by the law prohibiting fornication than to compel French to cooperate in breaking it. Rather than grant French an exemption from the MHRA, the state would rather grant everyone an exemption from the fornication statute. Such a result is absurd.

The state argues that, if French is granted an exemption, landlords would be able to discriminate against single people with children or even a divorced person who has remarried. We believe the response to this argument is self-evident. Here we are punishing French for refusing to disregard a statute prohibiting fornication *as well as* his religious beliefs.[5] The state clouds an

---

5. The state argues that there is no evidence here that fornication would take place and indicates that the "appearance of evil" belief is without merit. We find that position utterly specious. The *Sports & Health Club* court rejected this notion, and none of the other courts that have confronted this issue have even bothered to

comment on this point. The ALJ concluded that the couple intended to "cohabit," that is, live together in a sexual relationship. When French told Parsons why he would not rent to her, she did not deny that she intended to fornicate in the home. French specifically asked Parsons' fiancé if he planned to use this home

already murky analysis by referring to cases involving discrimination against constitutionally recognized suspect classes.

There are certain moral values and institutions that have served western civilization well for eons. *See Maynard v. Hill,* 125 U.S. 190, 211, 8 S.Ct. 723, 729–30, 31 L.Ed. 654 (1888) (characterizing marriage as "the foundation of family and society, without which there would be neither civilization nor progress"), *cited with approval in Zablocki v. Redhail,* 434 U.S. 374, 384, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978). This generation does not have a monopoly on either knowledge or wisdom. Before abandoning fundamental values and institutions, we must pause and take stock of our present social order: millions of drug abusers; rampant child abuse; a rising underclass without marketable job skills; children roaming the streets; children with only one parent or no parent at all; and children growing up with no one to guide them in developing any set of values.[6] How can we expect anything else when the state itself contributes, by arguments of this kind, to further erosion of fundamental institutions that have formed the foundation of our civilization for centuries?[7]

Since our decision is based entirely on interpretation of our state statutes and on the Minnesota Constitution, we need not address respondent's arguments as to the application of the United States Constitution, and we decline to do so. We find that, on statutory grounds and on the grounds of the Minnesota Constitution, French was within his rights in refusing to rent to Parsons.

In summary, because the state should not be able to force a person to break one statute to obey another, because there is a less restrictive means to reconcile the statutes in question, and because of the state's paramount need under our constitution to protect religious freedom, we reverse the decision of the court of appeals.

SIMONETT, Justice (concurring as to Part I).

I join Part I of the court's opinion. Because the issue of statutory construction is dispositive here, I do not reach the constitutional questions.

POPOVICH, Chief Justice (dissenting).

I respectfully dissent. Precedent establishes the refusal to rent real property to an unmarried woman because she would be

---

for purposes of having sex and he refused to answer. Failure to deny a material fact such as this when it would have been natural to deny it if it were not true permits an inference that it was true. *See Erickson v. Erickson & Co.,* 212 Minn. 119, 125, 2 N.W.2d 824, 827 (1942). That Parsons would insist on renting only if she could reside there with her fiancé and suggest that no sexual intercourse would take place is difficult to believe to say the least. Even if we accept that fairy tale, it misses the point: French's religious beliefs prohibit the living together of an unmarried man and woman regardless of whether sexual intercourse takes place.

6. In a recent press interview, United States Representative Patricia Schroeder (D–Colorado), a leading Congressional expert on family and children's issues, stated:

We [the United States] are number one in divorce, domestic violence, drug and alcohol abuse and adolescent everything. * * *

If we are number one in families falling apart and at the bottom in supporting families, do you suppose there is a correlation?

The Minnesota Women's Press, March 28, 1990, at 1, col. 3.

7. In a recent thought-provoking magazine article, the author discussed the phenomenon of family breakdown and accompanying social problems and made the following observation:

Given family integrity's essential importance, one might have expected society-wide efforts to support and encourage two-parent families when signs of rot were first detected, in the 1960s. That didn't happen. For the past quarter century American public policy has shied away from the idea that certain family forms are more desirable than others. There is no attempt to promote childbearing within wedlock. There is little penalty attached to child abandonment. There is scant recognition of the social benefits of marriage, or of the social contributions of those who devote themselves to conscientious childrearing. There is no reward from our public programs for standing by kith and kin.

Zimmerman, *Growing Up Scared,* The Atlantic Monthly, June 1990, at 52. Elsewhere in the article, the author noted that support is growing for incentives in favor of intact families in public housing programs. *See id.* at 53–56.

living with her fiance is a prima facie violation of the Minnesota Human Rights Act's (MHRA) prohibition of marital status discrimination. I believe the majority misconstrues legislative history, public policy and the facts presented to reach a result contrary to this court's interpretation of the MHRA.

## I.

The Minnesota Human Rights Act provides in relevant part:

> It is an unfair discriminatory practice:
> (1) For an owner, lessee * * *
> (a) to refuse to sell, rent, or lease * * * any real property because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, or familial status.

Minn.Stat. § 363.03, subd. 2 (1988).[1] The Act defines "marital status" as "whether a person is single, married, remarried, divorced, separated, or a surviving spouse." Minn.Stat. § 363.01, subd. 40 (1988). The Minnesota Human Rights Act is to "be construed liberally for the accomplishment of [its] purposes," Minn.Stat. § 363.11 (1988), which include "secur[ing] for persons in this state, freedom from discrimination [i]n employment [and i]n housing." Id., § 363.12.

With regard to marital status discrimination, states are split on whether "living together" falls within the definition of "marital status." Minnesota has taken the position that it does. Our precedents are clear that discriminating against an individual because of the person that individual lives with constitutes marital status discrimination. In *Sports & Health Club*, we held that an employer discriminated on the basis of marital status when it refused to hire job applicants who were living with, but not married to, persons of the opposite sex. 370 N.W.2d at 847, 849–50; *see also State ex rel. Cooper v. Mower County*

*Social Servs.*, 434 N.W.2d 494, 498–99 (Minn.App.1989) (refusal to hire pregnant unmarried woman because she lives with her boyfriend is marital status discrimination); *State ex rel. Johnson v. Porter Farms, Inc.*, 382 N.W.2d 543, 547 (Minn. App.1986) (termination of employee because he lives with a person of the opposite sex is marital status discrimination).

The conduct at issue here, the refusal to rent to an unmarried woman because she was single and living with a person of the opposite sex, constitutes marital discrimination and a prima facie violation of the Minnesota Human Rights Act. After agreeing to rent the property to Parsons, French not only decided Parsons had a romantic relationship with her fiance, but he also decided Parsons and her fiance likely would engage in sexual relations outside of marriage while living on the property. Despite being questioned by French, neither Parsons nor Jenson told French whether they were planning to have sexual relations on the subject property. Thus, when he refused to rent to Parsons, French had no knowledge of Parsons' actual or intended sexual activity. French, as owner and lessor, admits that had Parsons been married when she sought to rent the property, he would not have objected to renting to her. There is no "dispute," as the majority claims, regarding whether French had knowledge of Parsons' intended sexual activity with her fiance. The administrative law judge did *not* find that Parsons was going to live with her fiancee in a sexual relationship, and could not make such a finding on this record. The administrative law judge's findings of fact include, "Parsons * * * intended to *reside* on the property with her fiancee. * * * [*French*] *informed her* that *he could not rent* the property to her because cohabitation by two unmarried adults of the opposite sex was not in accord with *his religious beliefs*." (Emphasis added). "Cohabitation"

---

**1.** The legislative history indicates that "marital status" was meant to include unmarried couples living together. Hearing on S.F. 419, Sen. Jud. Comm., Subcomm. on Jud. Admin., 66th Minn. Leg., April 20, 1973 (audio tape) (comments of Sen. Tennessen, co-author of the bill, and Phyl-

lis Janey, President of League of Human Rights Commissions, concerning housing discrimination, during public testimony on the bill); Hearing on H.F. 377, Sen. Jud. Comm., 66th Minn. Leg., May 5, 1973 (audio tape of Sen. Coleman, chief author of the bill).

was the reason French gave for refusing to rent to Parsons. Use of the word "cohabitation" does not necessarily assume a sexual relationship, and it is often used interchangeably with "living together." *See* Webster's New International Dictionary 520 (2nd ed.) and Webster's New Collegiate Dictionary 218 (1976). Thus, French's conduct in refusing to rent to Parsons because she was *single* and living with a person of the opposite sex constituted marital discrimination, a prima facie violation of the Minnesota Human Rights Act.

The majority ignores the holdings in *Kraft, Inc. v. State,* 284 N.W.2d 386 (Minn. 1979), *Sports & Health Club, Mower County,* and *Porter Farms,* relying instead on *Mister v. A.R.K. Partnership,* 197 Ill.App.3d 105, 143 Ill.Dec. 166, 553 N.E.2d 1152 (1990), an Illinois appellate court decision which disagrees with *Sports & Health Club* and the court of appeals' decision in this case. *Mister* is not controlling over this court and apparently represents a minority point of view. *See, e.g., Markham v. Colonial Mortgage Serv. Co., Assoc. Inc.,* 605 F.2d 566 (D.C.Cir.1979) (marital status discrimination to refuse housing financing to fiancees living together); *Foreman v. Anchorage Equal Rights Comm'n,* 779 P.2d 1199, 1203 (Alaska 1989) (prohibition of marital status discrimination includes unmarried couples of the opposite sex); *Hess v. Fair Employment & Housing Comm'n,* 138 Cal.App.3d 232, 235, 187 Cal.Rptr. 712, 714 (1982) (Fair Housing Act's prohibition of marital status discrimination includes unmarried couples of the opposite sex living together); *Atkisson v. Kern County Housing Auth.,* 59 Cal. App.3d 89, 99, 130 Cal.Rptr. 375, 381 (1976) (marital status discrimination to evict tenant for living with person of the opposite sex); *Zahorian v. Russell Fitt Real Estate Agency,* 62 N.J. 399, 405, 301 A.2d 754, 757 (1973) (marital status discrimination includes refusal to rent to young, unmarried women who desire to live together); *Munroe v. 344 East 76th Realty Corp.,* 113 Misc.2d 155, 157, 448 N.Y.S.2d 388, 390 (N.Y.Sup.Ct.1982) (marital status discrimination to evict unmarried couple of the opposite sex because they are living togeth-

er); *Yorkshire House Assocs. v. Lulkin,* 114 Misc.2d 40, 44, 450 N.Y.S.2d 962, 965 (N.Y.Civ.Ct.1982) (same); *Loveland v. Leslie,* 21 Wash.App. 84, 583 P.2d 664 (1978) (marital status discrimination for landlord to rent to only married couples). Until the holdings in *Kraft, Sports & Health Club, Mower County,* and *Porter Farms* are overruled, we are obliged to follow clear, established precedent in this state that discriminating against an individual because of the person that individual lives with constitutes marital status discrimination. *See Kraft,* 284 N.W.2d at 387-88.

II.

Once a prima facie discrimination case is established, a presumption of discrimination arises and the burden shifts to appellant to prove his conduct was motivated by a legitimate nondiscriminatory defense. *Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986); *Sports & Health Club,* 370 N.W.2d at 849. The remaining question is whether there was a "legitimate nondiscriminatory" defense for French's violation. French asserts two defenses: free exercise of religion and due process/equal protection.

Is appellant's first amendment right to free exercise of religion violated by enforcement of this provision of the Human Rights Act against him? While there is an absolute right to hold religious beliefs, *Wisconsin v. Yoder,* 406 U.S. 205, 214, 219, 92 S.Ct. 1526, 1532, 1535, 32 L.Ed.2d 15 (1972); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), religiously grounded conduct is not absolutely protected. *Bowen v. Roy,* 476 U.S. 693, 699, 106 S.Ct. 2147, 2151-52, 90 L.Ed.2d 735 (1986); *Yoder,* 406 U.S. at 220, 92 S.Ct. at 1535-36; *Braunfeld v. Brown,* 366 U.S. 599, 603, 81 S.Ct. 1144, 1145-46, 6 L.Ed.2d 563 (1961). Although the free exercise clause may provide an individual an exemption from the enforcement of an applicable government regulation, *see Thomas v. Review Bd.,* 450 U.S. 707, 718-19, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner,* 374 U.S. 398, 408-09, 83 S.Ct. 1790, 1796-97, 10 L.Ed.2d 965

(1963), the clause does not automatically override a conflict with a state statute. Instead, a burden on an individual's practice of religious beliefs must be balanced against the state's interest in the burdensome regulation, *Yoder*, 406 U.S. at 214, 92 S.Ct. at 1532–33, with the burden permitted whenever the state interest is overriding or compelling and the interest cannot be achieved by alternative means. *United States v. Lee*, 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982); *Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533.

Our leading case establishes a four-part test for analyzing a request for an exemption from a statute based on the free exercise of religion under both the federal and state constitutions:

1. whether the objector's religious belief is sincerely held;
2. whether the state regulation burdens the exercise of this religious belief;
3. whether the state interest in this regulation is overriding or compelling; and·
4. whether the state regulation uses the least restrictive means.

*Sports & Health Club*, 370 N.W.2d at 851. An individual claiming an exemption must prove the first two parts, but the state can successfully defend its statute by proving the third and fourth requirements. L. Tribe, *American Constitutional Law* § 14–12, at 1242 (2d ed. 1988). The majority's attempt to interpret the Minnesota Constitution's Freedom of Conscience provision more broadly is not supported by a single decision of this court.

### 1. *Sincerely Held Religious Beliefs.*

The first requirement is the individual must have a sincerely held religious belief with regard to the contested matter. *Thomas*, 450 U.S. at 714–16, 101 S.Ct. at 1430–31; *Yoder*, 406 U.S. at 215–16, 92 S.Ct. at 1533–34. This is a subjective, personal test, and we are not to question the propriety or correctness of this belief or religious doctrine. *Lee*, 455 U.S. at 257, 102 S.Ct. at 1055; *Thomas*, 450 U.S. at 714–16, 101 S.Ct. at 1430–31. According to French, he believes "sex outside of marriage is sinful [and] living together * * * constitutes the 'appearance of evil' to which I am also opposed." The sincerity of these beliefs is undisputed, and French has satisfied this requirement.

### 2. *Burden on Religious Belief.*

Second, an individual claiming an exemption must show the applicable government regulation burdens this sincerely held religious belief. A leading treatise summarizes:

[B]urden looks to the degree that the government's requirement will, directly or indirectly, make the believer's religious duties more difficult or more costly.

L. Tribe, *supra*, § 14–12 at 1247, and

[A] conflict that threatens the very survival of the religion or the core values of a faith poses more serious free exercise problems than does a conflict that merely inconveniences the faithful.

*Id.* at 1246. An affirmative obligation or prohibition combined with sanctions is more burdensome than a denial of benefits. *Bowen*, 476 U.S. at 704, 106 S.Ct. at 2154; *Yoder*, 406 U.S. at 218, 92 S.Ct. at 1534. The burden on appellant's religious beliefs is the choice French was required to make between adhering to his religious beliefs—that living together outside of marriage is immoral—by refusing to rent to unmarried couples living together, or modifying his behavior to comply with the Human Rights Act. *See Lee*, 455 U.S. at 261, 102 S.Ct. at 1057; *Thomas*, 450 U.S. at 717–18, 101 S.Ct. at 1431–32.

The distinction between public and private activities underlies freedom of religion cases. The U.S. Supreme Court has recognized that the Minnesota Human Rights Act properly "adopted a functional definition of public accommodations that reaches various forms of public, quasi-commercial conduct." *Roberts v. United States Jaycees*, 468 U.S. 609, 625, 104 S.Ct. 3244, 3254, 82 L.Ed.2d 462 (1984). In *Lee*, the Supreme Court stated: "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of

conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." 455 U.S. at 261, 102 S.Ct. at 1057. We also recognized this distinction in *Sports & Health Club:*

> [T]he government has a responsibility to afford its citizens equal access to all accommodations open to the general public. * * * Sports and Health * * * is not a religious corporation—it is a Minnesota business corporation engaged in business for profit. By engaging in this secular endeavor, appellants have passed over the line that affords them absolute freedom to exercise religious beliefs. * * * when appellants entered into the economic arena and began trafficking in the market place [sic], they have subjected themselves to the standards the legislature has prescribed not only for the benefit of prospective and existing employees, but also for the benefit of the citizens of the state as a whole in an effort to eliminate pernicious discrimination.

370 N.W.2d at 853.

While the scale of the public activity here is not as large as in *Sports & Health Club,* the legislature has drawn the line distinguishing public and private activity as it relates to rental housing by excepting "the rental by a resident owner or occupier of a one-family accommodation of a room or rooms in the accommodation" from several of the Human Rights Act's prohibitions, including marital status discrimination. Minn.Stat. § 363.02, subd. 2(1)(b) (Supp. 1989). We are not in a position to question or redraw this line since the legislature in its wisdom determined the exemption. The private activity exemption from the Human Rights Act does not extend to someone, such as French, renting property where he does not live.

French contends this distinction says constitutional liberties do not apply in the public arena, but in reality by entering the public marketplace one is subjecting oneself to laws concerning public behavior, including anti-discrimination laws, that must be balanced against first amendment interests. There is no first amendment right to yell "fire" in a crowded theater. Upon entering the public marketplace appellant could no longer consider just his rights and beliefs, but became subject to certain state laws and the rights of potential tenants. The legislature has not exempted an isolated sale or rental of property other than the property where the landlord resides. As respondent states "the First Amendment does not bestow upon the individual an absolute right to require others in the marketplace to adopt those values as a precondition to doing business with him or her." Appellant is free, in his private life, to not associate with anyone whom he feels has the "appearance of evil," but when someone voluntarily enters the public marketplace he may encounter laws that are inconsistent with his religious beliefs. While the Act imposes a burden on French's sincerely held religious belief that living together is sinful, such a burden is greatly lessened because it occurred only when French voluntarily entered into the rental marketplace—by crossing over the line drawn by the legislature—and thus subjecting himself to potentially burdensome regulations such as the Act's prohibition of marital status discrimination.

### 3. State's Overriding or Compelling Interest.

If the state shows it has a compelling or overriding interest for the burdensome regulation it can prevent a religious-based exemption from that regulation. *Lee,* 455 U.S. at 257–58, 102 S.Ct. at 1055–56; *Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533; *Sherbert,* 374 U.S. at 403, 83 S.Ct. at 1793–94. If the state interest is compelling, it will overbalance any burden on religious beliefs.[2] The question thus is whether the

---

2. On April 17, 1990, the Supreme Court abandoned the need for a compelling state interest when interpreting a generally applicable criminal statute in a 5–4 decision written by Justice Scalia, who said:

Precisely because we are a cosmopolitan nation made up of people of almost every conceivable preference, * * * and precisely because we value and protect that religious divergence, we cannot affirm the luxury of deeming *presumptively invalid,* as applied to

State of Minnesota has a compelling or overriding interest in enforcing the Human Rights Act's prohibition of marital status discrimination in rental housing. Relying on very old cases from other jurisdictions, appellant contends the only possible state interest is promoting public health, safety, or morality, but this completely ignores the Human Rights Act and controlling precedent from both this court and the U.S. Supreme Court.

Courts have repeatedly recognized there is a compelling state interest in eradicating invidious discrimination. *E.g.*, *Roberts*, 468 U.S. at 626, 104 S.Ct. at 3254 (gender); *Bob Jones University v. United States*, 461 U.S. 574, 604, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983) (race); *Gay Rights Coalition v. Georgetown Univ.*, 536 A.2d 1, 38 (D.C.App.1987) (sexual orientation); *see also EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1280 (9th Cir.1982) ("elimination of all forms of discrimination [is a] 'highest priority.' * * * [the] purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions.") (citations omitted).

The U.S. Supreme Court case most similar to the present case is *Bob Jones University*, where discriminatory practices were defended on a free exercise of religion basis. The University claimed the IRS Commissioner's "policy cannot constitutionally be applied to schools that engage in racial discrimination on the basis of sincerely held religious beliefs." 461 U.S. at 602, 103 S.Ct. at 2034. Despite finding sincerely held religious beliefs and a burden on these beliefs, *id.* at 602–04 & n. 28, 103 S.Ct. at 2034–35 & n. 28, the Court held that preventing discrimination clearly is a compelling state interest using the least restric-

tive means, and thus held that invidious discrimination cannot be justified by religious beliefs. *Id.* at 604, 103 S.Ct. at 2035.

Providing equal access to housing in Minnesota by eliminating pernicious discrimination, including marital status discrimination, is an overriding compelling state interest. The majority outlines numerous situations where the *state, not private individuals,* treats people differently because of their marital status. The facts of this case involve one individual discriminating against another individual because of marital status. Housing is a basic human need regardless of a person's personal characteristics, and the legislature has properly determined that it should be available without regard to "race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, or familial status." Minn.Stat. § 363.03, subd. 2(1)(a). "[A] court cannot lightly dispute a determination by the political branches that the * * * interests at stake are compelling." *Finzer v. Barry,* 798 F.2d 1450, 1459 (D.C.Cir.1986), *aff'd sub nom. Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). An individual's marital or familial status, just like the other prohibited classifications, is irrelevant to holding a job or renting a house, because it "bears no relation to the individual's ability to participate in and contribute to society." *Mathews v. Lucas,* 427 U.S. 495, 505, 96 S.Ct. 2755, 2762, 49 L.Ed.2d 651 (1976).

The Human Rights Act is to "be construed liberally for the accomplishment of [its] purposes," Minn.Stat. § 363.11 (1988), which include "secur[ing] for persons in this state, freedom from discrimination [i]n employment [and i]n housing." *Id.* § 363.12. In interpreting the Minnesota

---

the religious objector, every regulation of conduct that does not protect an interest of the highest order. To rule in respondent's favor would open the prospect of constitutionally required religious exemption from civic obligations of almost every conceivable kind * * *. The First Amendment's protection of religious liberty does not require this.

It reversed the Oregon Supreme Court and held that while it is constitutionally permissible

to exempt sacramental peyote use from operations of drug laws, it is not constitutionally required. *Employment Division Department of Human Resources of Oregon, et al., v. Alfred Smith et al.,* (U.S.1990).

Arguably, the same analysis would apply to a generally applicable anti-discrimination statute, but such analysis is not necessary since the government interest in this case meets the compelling state interest standard.

Human Rights Act, the U.S. Supreme Court stated:

> [A]cts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit. * * * such practices are entitled to no constitutional protection.

*Roberts*, 468 U.S. at 628, 104 S.Ct. at 3255. The Act "reflects [Minnesota's] strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services." *Id.* at 624, 104 S.Ct. at 3253. The *Roberts* Court found Minnesota, under the Act, had a compelling interest in eradicating discrimination against its female citizens. *Id.* at 626, 104 S.Ct. at 3254. In *Sports & Health Club*, where one of the Human Rights Act violations was a refusal to hire people living together, we stated the government clearly has

> an overriding compelling interest in prohibiting discrimination in employment and public accommodation. * * * In a pluralistic and democratic society, government has a responsibility to insure that all its citizens have equal opportunity for employment, promotion, and job retention without having to overcome artificial and largely irrelevant barriers occurring from gender, status, or beliefs to the main decision of competence to perform the work. * * * The [state has an] overriding compelling interest [in] eliminating discrimination based upon sex, race, marital status, or religion * * *.

370 N.W.2d at 853. The majority ignores the *Sports & Health Club*'s holding. Since it is not overruled, we are obliged to follow its precedent.

The Supreme Court has emphasized, "Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has *never* been accorded affirmative constitutional protections." *Norwood v. Harrison*, 413 U.S. 455, 470, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973) (emphasis added). "This is not to say, however, that enforcement of laws that ban discrimination will always be without cost to other values, including constitutional rights." *Hishon v. King & Spalding*, 467 U.S. 69, 80 n. 4, 104 S.Ct. 2229, 2236 n. 4, 81 L.Ed.2d 59 (1984) (Powell, J., concurring). "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984). Both our court's and the Supreme Court's precedents support an affirmance. The majority fails to point to a single discrimination case that has been successfully defended on free exercise of religion grounds or a single case holding that the state's interest in eradicating any type of invidious discrimination is less than compelling. Preventing marital status discrimination is a compelling state interest, *Sports & Health Club*, 370 N.W.2d at 853, and discrimination in rental housing is not permitted by the Human Rights Act or the first amendment.

Religious and moral values include not discriminating against others solely because of their color, sex, or whom they live with, avoiding unnecessary emotional suffering, showing tolerance for nontraditional lifestyles, and treating others as one would wish to be treated. This supposedly immoral couple were married by the time of the ALJ hearing, furthering the values the majority promotes. It may be difficult for some individuals to recognize invidious discrimination, but one must not lose sight of the continuing fight of minorities to be protected from a "probable majority" point of view. It was not long ago that blacks and women were widely viewed as second-class citizens. Discrimination usually comes in less obvious forms—such as against single parents, those with AIDS, homosexuals, the elderly, and those living together—but no less invidious forms. The majority, in effect, would have us return to the day of "separate but equal" where individuals such as French would be permitted to keep their neighborhoods free of "undesirables" and "nonbelievers." *See Shelley v. Kraemer*, 334 U.S. 1, 10–13, 68

S.Ct. 836, 840–42, 92 L.Ed. 1161 (1948) ("Equality in the enjoyment of property rights was regarded by the framers * * * as an essential pre-condition to the realization of other basic civil rights and liberties * * *.").

Although French admits his conduct constituted marital status discrimination in violation of the Human Rights Act, he would have us completely ignore the Act, instead contending the central question of this case is: "what compelling interest does the State of Minnesota have in promoting cohabitation and/or fornication?" French contends the state's interest should be Minnesota's fornication statute, which makes it a misdemeanor for "any man and single women [to] have sexual intercourse with each other." Minn.Stat. § 609.34 (1988). While we rejected this argument in *Sports & Health Club*, the majority decision rests upon it.

A refusal to rent based *solely* on a prospective tenant's clear violation of a criminal statute is not prohibited by the Human Rights Act. This is not the situation here, however. The Department is not applying the fornication statute, there was absolutely no evidence of fornication, and fornication is not the prima facie discrimination case proven. French admits he did not know whether Parsons and Jenson were going to have sexual relations on the property when he refused to rent, but he states "even if Ms. Parsons and Mr. Jenson were not planning to have sex on the premises * * * their * * * living together on the premises constitutes the 'appearance of evil' to which I am also opposed." There was only speculation about sexual relations, no facts, but "[d]iscriminations are not to be supported by mere fanciful conjecture." *Hartford Co. v. Harrison*, 301 U.S. 459, 462, 57 S.Ct. 838, 840, 81 L.Ed. 1223 (1937).

The appearance of evil argument is without merit. The Act prohibits marital *status* discrimination, here French concludes living together status assumes certain *conduct*, which he can then use to discriminate. There is nothing, however, in the fornication statute outlawing unmarried couples from living together or saying only couples living together are capable of fornication. French had previously rented to married couples and single people; people equally capable of fornicating on his property. There is nothing inherently suspect about two unmarried people of the opposite or same sex living together. While we do not choose between competing moral values, the majority equates the recent proliferation of unmarried couples living together with a loosening of our social fabric. Surely the legislature intended this group to also be deserving of protection from invidious discrimination. The decision to marry is a fundamental right, *Zablocki v. Redhail*, 434 U.S. 374, 384, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978), and the right to privacy includes "personal decisions 'relating to marriage.'" *Carey v. Population Servs. Int.*, 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977).

The Human Rights Act prohibited appellant from even inquiring about Parsons' marital status, Minn.Stat. § 363.03, subd. 2(1)(c) (1988), and Parsons and Jenson had absolutely no duty to protest their innocence when illegally questioned. In addition, enforcement of Minnesota's criminal statutes is not left up to the suspicions of individual landlords, as appellant admits "[t]he Human Rights Act in no way prevents the State from prosecuting charges of fornication." Had Parsons told French she planned to have sexual relations on the property this may be a different case, but those are not the facts before us. This is not a case involving discrimination against fornicators, rather it is a case involving discrimination against single people living together.

Because Minn.Stat. § 609.34 makes fornication a misdemeanor, French also contends he would be aiding and abetting the commission of fornication and thus subjecting himself to criminal liability if he rented to Parsons and Jenson. The majority somehow believes the state is enforcing or promoting the fornication statute in this case, but it has failed to point to what *facts in the record* make the fornication statute applicable here. The enforcement of criminal laws, such as fornication, by the state,

should occur only in a court of law, where defendants have constitutional protections such as the requirement of proof beyond a reasonable doubt, the right of a defense, the right to a jury trial, and the right to challenge the constitutionality of such statutes. Moreover, to be liable as an aider or abettor, one must encourage another person "to take a course of action which he might not otherwise have taken." *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981); *see also* Minn.Stat. § 609.05, subd. 1 (1988). Leasing property to a tenant does not create criminal liability for aiding and abetting. *People of Kane County v. Midway Landfill, Inc.*, 23 Ill.App.3d 1080, 1083, 321 N.E.2d 91, 94 (1974); 49 Am.Jur.2d *Landlord and Tenant* § 10 (1970).

Although the legislature has refused to repeal Minnesota's fornication statute, and it may be of questionable constitutionality, it has fallen into disuse. Not only are there just two reported convictions for fornication in Minnesota, the last in 1927, *see State v. Cavett*, 171 Minn. 222, 213 N.W. 920 (1927); *State v. Gieseke*, 125 Minn. 497, 147 N.W. 663 (1914), and no reported convictions for aiding and abetting fornication, we recently noted that police and prosecutors generally consider the fornication statute unenforceable. *In re Agerter*, 353 N.W.2d 908, 915 (Minn.1984). The majority cites one case, *State v. Ford*, 397 N.W.2d 875 (Minn.1986), to suggest the fornication statute remains sound. That the defendant in *Ford* ultimately pleaded guilty to other offenses does little to bolster the majority's position. While a challenge to the fornication statute is not before us, other states have struck down their fornication statutes under equal protection. *E.g., Purvis v. State*, 377 So.2d 674, 677 (Fla.1979); *Commonwealth v. Staub*, 461 Pa. 486, 491–92, 337 A.2d 258, 261 (1975).

Appellant also would have us distinguish between "bad" types of discrimination, such as based upon race, gender, or handicap, and "good discrimination," such as against drug dealers, child abusers, and fornicators (people living together). French cites no cases breaking up an antidiscrimination statute into discrete parts and finding the interest in eradicating certain types of discrimination to be less than compelling. In fact, the District of Columbia Court of Appeals refused to single out its prohibition of sexual preference discrimination as less than compelling. *Gay Rights Coalition*, 536 A.2d at 38. We should reaffirm that the prevention of invidious discrimination in Minnesota, including on the basis of marital status, is a compelling state interest.

### 4. *Least Restrictive Means.*

The last requirement is that the state regulation use the least restrictive means of achieving the state's goals. Although the government has a compelling interest that justifies a burden on religious activity, the state must also show the regulation is no more burdensome than necessary to promote the secular interest. *Thomas*, 450 U.S. at 718, 101 S.Ct. at 1432. *Sherbert*, 374 U.S. at 407, 83 S.Ct. at 1795–96. Courts have found some alternatives to be less restrictive and less burdensome on an individual's free exercise rights. *See Yoder*, 406 U.S. at 225, 92 S.Ct. at 1538.

French contends a less restrictive means is for the state simply to not enforce the Act's prohibition of marital status discrimination. That is not a less restrictive means; it would be a complete abrogation of the state's goal of preventing invidious discrimination. *See Gay Rights Coalition*, 536 A.2d at 39 (refusing to abrogate state interest in eradicating sexual orientation discrimination). Previous cases have refused to abolish the goals behind preventing marital status discrimination. *Sports & Health Club*, 370 N.W.2d at 847, 853–54; *Porter Farms*, 382 N.W.2d at 548. The recent *Gender Fairness Report* recognized the problem of discrimination against unmarried couples living together. *See Minnesota Supreme Court Task Force for Gender Fairness in the Courts*, 15 Wm. Mitchell L.Rev. 825, 876 (1989). In fact, the 1990 census now being undertaken also recognizes this phenomenon and will determine the number of unmarried couples living together. Appellant's contention that the Act's prohibition of marital status dis-

crimination is unworthy of enforcement must be rejected.

The only possible less restrictive means is to grant those individuals with sincerely held religious beliefs an exemption from the Human Rights Act. We refused to grant such an exemption in *Sports & Health Club*, stating:

> The state's overriding compelling interest of eliminating discrimination based upon sex, race, marital status, or religion could be substantially frustrated if employers, professing as deep and sincere religious beliefs as those held by [the Sports & Health Club] could discriminate against the protected classes.

370 N.W.2d at 853. Federal courts have also consistently refused to allow religious exemptions from anti-discrimination statutes. *Bob Jones University*, 461 U.S. at 604, 103 S.Ct. at 2035 (free exercise exemption "cannot be accommodated" with prevention of discrimination); *EEOC v. Mississippi College*, 626 F.2d 477, 489 (5th Cir. 1980) ("creation of [a free exercise] exemption greater than that provided by [Title VII] would seriously undermine the means chosen by Congress to combat discrimination * * *."), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981). Granting exemptions from an anti-discrimination statute defeats its effectiveness in preventing discrimination. *Gay Rights Coalition*, 536 A.2d at 39. The legislature, in Minn.Stat. § 363.02, subd. 2(1)(b), has already drawn a line that grants an exemption from the Human Rights Act to small-scale landlords renting out a room in the home in which they live. The majority ignores our *Sports & Health Club* holding and the fact the legislature has already drawn a line for granting religiously based exemptions in the case of small-scale landlords. The majority's arguments properly should be left to the legislature. If the legislature wishes to redraw this line so as to exclude individuals like French from the Human Rights Act, it is perfectly free to do so. But until the legislature changes the statute it should be enforced as written, since it is within the permissible parameters of constitutional principles. Appellant's request for an exemption from the Human Rights Act would substantially hinder the fulfillment of the state's goal of preventing invidious discrimination. No alternative means appear available.

### III.

Enforcement of this provision of the Human Rights Act against French violates neither the federal due process or equal protection clauses. Appellant argues "due process/equal protection rights will protect *any landlord*" who objects to people of the opposite sex living together. (Emphasis added). French summarily asks us to find a violation of these provisions because the Act "seeks to penalize an individual who is seeking only to exercise a fundamental right." In substance, appellant argues even if it is not against your religious beliefs for persons of the opposite sex to live together, you can still discriminate against these people if you personally disagree with them living together. This basically amounts to a facial attack on the Act's prohibition of marital status discrimination.

Not only has appellant failed to identify what fundamental right is violated, but he was provided a full administrative hearing prior to being assessed a penalty. Preventing discrimination certainly is a legitimate government purpose necessary to survive a facial due process or equal protection challenge. *Sports & Health Club*, 370 N.W.2d at 853 (compelling state interest in preventing marital status discrimination); *AFSCME Councils 6, 14, 65 & 96 v. Sundquist*, 338 N.W.2d 560, 574 (Minn.1983) (rational basis needed to satisfy due process or equal protection challenge). French's equal protection and due process challenges lack merit.

### IV.

Discriminating against unmarried individuals living with members of the opposite sex is neither the cause or the solution to societal woes. The majority's decision rejects the reasoned precedents of this court. Unless the legislature acts differently or until those cases are overruled, we are

obliged to follow clear, established precedent in this state.

WAHL, Justice.

I join the dissent of Chief Justice Popovich.

KEITH, Justice.

I join the dissent of Chief Justice Popovich.