STATE of Minnesota, by Linda C. JOHN-
SON, Commissioner of the Department
of Human Rights, Respondent,

v.

PORTER FARMS, INC.,
Relator, Appellant,

and

James Sorenson, Respondent.

No. C6–85–1589.

Court of Appeals of Minnesota.

Feb. 25, 1986.

Hubert H. Humphrey, III, Atty. Gen., Nancy J. Leppink, Sp. Asst. Atty. Gen., St. Paul, for State of Minnesota, by Linda C. Johnson, Commissioner of the Department of Human Rights.

Gary G. Wollschlager, Fairmont, for Porter Farms, Inc.

D. Gerald Wilhelm, Fairmont, for James Sorenson.

Heard, considered and decided by SEDGWICK, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

RANDALL, Judge.

Porter Farms appeals from an administrative law judge's order requiring it and James Sorenson to cease and desist from discriminating on the basis of marital status; awarding compensatory, punitive and mental anguish damages to Randy Fitzloff; and assessing a civil penalty of $1,000 to be paid to the State. Porter Farms contends Fitzloff voluntarily quit his employment,

the relationship between Porter Farms and Sorenson was one of landlord and tenant, the administrative law judge incorrectly assessed damages, and the claim is barred by Minn.Stat. § 363.06, subd. 3 (1984). James Sorenson filed a notice of review contending that the Human Rights Act is unconstitutional as applied to him, that the Act does not apply to him because Fitzloff was engaged in "domestic service," and that the damage figure and penalties are both arbitrary and capricious and unsupported by substantial evidence. The Commissioner also filed a notice of review contending that she should have been allowed to amend her complaint to increase the amount of damages requested for mental anguish and suffering. We affirm as modified.

## FACTS

Porter Farms is a family-owned subchapter S corporation which owns 2,400 acres of farmland. The land is divided into four units and each is operated separately. Tom Tomlinson, the owner of a farm management corporation, manages Porter Farms among others.

James Sorenson began operating one of the units in 1980. According to Tomlinson, the board of the corporation decides who the operators will be and Sorenson "was brought in as a lieutenant for the dairy operation." Sorenson is responsible for feeding, milking and caring for the dairy herd and for harvesting alfalfa and corn for silage. He is not responsible for planting. Another Porter Farms operator is mainly responsible for the crops that are grown on the dairy unit. Sorenson lives with his family on the property and pays no rent.

In 1981, Sorenson signed a written agreement, retroactive to April 1, 1980, to purchase one-half interest in the dairy herd. Under the agreement Sorenson was to pay $65,000 for the one-half interest. His monthly payments of $500 are little more than interest payments. A balloon payment is due in July 1986.

The size of the herd varies. Porter Farms and Sorenson each receive 50 percent of proceeds from the sale of an animal and each pay 50 percent for the cost of a replacement. They also split the proceeds from the sale of dairy products; the loss of any animal that dies; veterinary bills; and the cost of fertilizer, seed, and herbicides.

The agreement to purchase an interest in the herd is the only written agreement between Sorenson and Porter Farms. They agree that Sorenson is to personally provide the labor to carry out his responsibilities or hire someone to help. In the latter case, he is responsible for wages and social security. However, in one instance, Porter Farms hired a custom operator to help with baling when Sorenson got behind, and, in that case, Porter Farms paid the baler. Sorenson provides most of the mobile machinery and is responsible for its maintenance and repair. Porter Farms provides the buildings, including the dairy parlor, and is responsible for upkeep. Sorenson and Porter Farms initially shared the expense of purchased feed. However, because of low cash flow in the past two years, Porter Farms has purchased feed and did not require Sorenson to pay the cost.

Porter Farms and Sorenson both stated that they do not consider themselves partners. They do not file a partnership tax return. While they try to agree on the way the dairy operation should be managed, Porter Farms has the final say. In essence, Sorenson makes proposals and Tomlinson approves or disapproves. They agree that Porter Farms has the right to terminate its relationship with Sorenson at its discretion. He could be terminated "immediately." Sorenson believes that he can leave at any time. The previous operator had the identical relationship that Sorenson has with Porter Farms. His ideas about running the operation were different from those of Porter Farms, so Porter Farms terminated him by telling him that "our views are not compatible."

Porter Farms bought a trailer house and installed it on the farm to insure that some-

one other than Sorenson would be available for milking. In March, 1983, Sorenson hired Randy Fitzloff to work part time to take care of the cows. Several weeks later Sorenson offered Fitzloff full-time work on the condition that he live in the trailer located on the farm. Fitzloff, Karla Kitzerow, and their daughter moved to the trailer. Milking was added to Fitzloff's duties. His compensation was $500 a month in cash plus use of the trailer and utilities, dairy products and meat. At Sorenson's suggestion, Fitzloff purchased a pick-up truck so he could earn overtime pay and a mileage allowance by using the truck to haul hay to the farm.

In early July a letter arrived at the farm addressed to Ms. Kitzerow. Sorenson's wife asked Kitzerow about her surname and Kitzerow informed her that she and Fitzloff were not married. A day or two later, Sorenson told Fitzloff that he would have to make a major decision in his life because he was living in sin. Sorenson told Fitzloff he would either have to marry Kitzerow or have her move out of the trailer, otherwise he would have to leave. Sorenson gave Fitzloff seven days to make his decision and two months to carry it out.

After the seven days passed Sorenson asked Fitzloff if he had made his decision. Fitzloff asked if Kitzerow was interfering with his work. Sorenson replied, "that doesn't matter" and asked again for Fitzloff's decision. Fitzloff said that he and Kitzerow would probably be getting married but not within the two month limitation set by Sorenson. Sorenson said, "you're through" and repeated it when Fitzloff asked what he meant. Fitzloff told Sorenson that his act constituted discrimination. Fitzloff did not report to work again.

Sorenson delivered a note to Fitzloff on July 18 telling him to move out of the trailer no later than August 7. Fitzloff, Kitzerow, and their daughter moved to Fitzloff's parent's home on July 19. Kitzerow and their daughter lived with Fitzloff's parents for five months before moving out because of the deteriorating relationship between Fitzloff and Kitzerow.

Fitzloff sought other employment, but could not find work for three months. He began working at Fairmont Refrigerated on October 13 and worked for nine months before being laid off for six months. During the layoff Fitzloff received $273 in unemployment compensation every two weeks. He earned $415 by working for another firm for ten days.

Fitzloff filed a charge with the Department of Human Rights. After a hearing the administrative law judge concluded (1) Fitzloff was discharged because of his marital status, (2) Sorenson discriminated against Fitzloff because of sincerely held religious beliefs, (3) Sorenson is not a tenant of Porter Farms but rather is an employee or agent who manages the dairy operation, (4) Porter Farms did nothing to prevent the discrimination and did nothing to discipline Sorenson, to rescind the termination, or to minimize damages, (5) Fitzloff is entitled to compensatory, punitive, and mental anguish damages, and (6) a civil penalty of $1,000 is appropriate.

## ISSUES

1. Was Fitzloff terminated because of discrimination based on marital status?

2. Is the Human Rights Act unconstitutional as applied to Sorenson?

3. Does the Human Rights Act facially and as applied violate the free exercise of religion guaranteed by Article 1, Section 16 of the Minnesota Constitution?

4. Is the relationship between Porter Farms and Sorenson one of landlord and tenant, or employer-employee?

5. Is Fitzloff unprotected by the Human Rights Act because he is a domestic servant?

6. Did the administrative law judge abuse his discretion in awarding damages?

7. Is Fitzloff's action against Porter Farms barred by Minn.Stat. § 363.06, subd. 3?

## ANALYSIS

The administrative law judge's order constitutes the final decision of the Department of Human Rights. Minn.Stat. § 363.071, subd. 2 (1984). Judicial review of the Department's decision is governed by the Administrative Procedures Act, Minn.Stat. § 14.63–.69 (1984). Minn.Stat. § 363.072 (1984). This court may modify or reverse its decision only if we find its findings, inferences, conclusions or decision is

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Minn.Stat. § 14.69.

### I.

*Termination*

■ Porter Farms initially contends Fitzloff voluntarily quit his employment. Specifically it argues that while Sorenson did tell Fitzloff that he would have to leave if he did not marry Kitzerow or have her move out, Fitzloff voluntarily quit by not reporting to work, and the conclusion that he was terminated is based on speculation.

The administrative law judge found that Sorenson told Fitzloff "you're through." Fitzloff believed he was being fired and told Sorenson that such an action was illegal discrimination. Fitzloff did not report to work again because he understood that he had been fired. Sorenson did nothing inconsistent with Fitzloff's interpretation of the conversation. Substantial evidence supports the finding that Fitzloff was terminated.

■ Porter Farms also claims that Fitzloff was not given the choice—to leave or to marry Kitzerow or to have her move out—based on his marital status, but because Sorenson objected to Fitzloff's sexual relationship with Kitzerow. It further claims that the prohibition against discharging an employee because "marital status" in Minn.Stat. § 363.03, subd. 1(2)(b) (1984) does not extend to discharging because of a sexual relationship.

In *State by McClure v. Sports & Health Club*, 370 N.W.2d 844 (Minn.1985) *petition for cert. filed* (United States Supreme Court), the supreme court affirmed an administrative law judge's finding that the Sports & Health Club violated Minn.Stat. § 363.03, subd. 1(2) by both refusing to "hire and [firing] individuals living with but not married to a person of the opposite sex * * *." *Id.* at 847. In doing so it extended the protection of the Human Rights Act to unmarried couples. We cannot make the distinction in this case that Porter Farms asks us to make.

The administrative law judge concluded that there had been discrimination based on marital status because Fitzloff refused to marry. He noted that if Fitzloff had done "what the boss ordered" his employment would not have been terminated.

### II.

*Constitutionality*

■ In *Sports and Health Club*, the supreme court held that the Minnesota Human Rights Act facially and as applied does not violate an employer's right of free speech, free exercise of religion or freedom of association as guaranteed by the First Amendment of the United States Constitution and Article 1, Section 16 of the Minnesota Constitution. In determining whether the statute as applied was constitutional it used a three-step analysis:

1. Does the act actually impose a burden upon a person's free exercise of religion?

2. If such a burden is found to exist, is the burden justified by compelling governmental interests?

3. Is the questioned regulation the least restrictive means to achieve the State's goals?

*Sports & Health Club* at 851 (citations omitted). Sorenson contends that the facts of his case are significantly different from those in *Sports & Health Club*, and, under the circumstances of this case, the Human Rights Act is unconstitutional as applied to him. Specifically, Sorenson argues that the Human Rights Act impacts upon him more heavily than upon the plaintiffs in *Sports & Health Club* because the associational and religious freedoms alleged by defendants in *Sports & Health Club* were exercised in the marketplace while his are being exercised in his home. He therefore concludes that the interests of the State are not sufficiently compelling to require enforcement of the Act.

We find no distinctions in this case which support a reconsideration of the supreme court's decision in *Sports & Health Club*. In that case the supreme court squarely held that "the government had an overriding compelling interest in prohibiting discrimination in employment * * *." *Id.* at 853. Sorenson employed Fitzloff not to work *in* his home but to work near his home. The fact that Sorenson required Fitzloff to live in a trailer near his home as a condition of employment does not alter the prohibition against discrimination in employment.

### III.

#### Freedom of Religion

■ Sorenson also contends that while the supreme court, in *Sports & Health Club*, extended the protection of the Human Rights Act to those employees and prospective employees living with a person of the opposite sex to whom they were not married, the issue is not moot because the protection was extended without discussion by the majority. Sorenson asks this court to reconsider the decision under Article 1, Section 16 of the Minnesota Constitution. We will not do so. Appellants in *Sports & Health Club* asserted their rights under Article 1, Section 16 and the supreme court held that facially and as applied the Human Rights Act does not violate the free exercise of religion as guaranteed by Article 1,

Section 16. There is nothing for us to consider.

### IV.

#### Agency

■ The administrative law judge concluded that the relationship between Porter Farms and Sorenson is not one of landlord and tenant but rather Sorenson is an employee or agent of Porter Farms and he receives free rent as part of his compensation for working as a manager of the dairy operation. Porter Farms contends that the relationship between it and Sorenson is typical of the crop-share relationship used on farms throughout the State and is one of landlord and tenant. The State urges us to affirm the administrative law judge's conclusion that an employer-employee relationship exists or in the alternative to find that Porter Farms and Sorenson are partners.

Initially, Porter Farms contends that the administrative law judge's decision not to admit an unsigned lease agreement was prejudicial error. The administrative law judge refused to admit the lease into evidence because Porter Farms was no longer using it and because there was no demonstration that it was relevant. We find no abuse of discretion in this ruling.

The question of the construction of the relationship created by a contract to farm on shares was discussed in *Larson v. Archer-Daniels-Midland Co.*, 226 Minn. 315, 32 N.W.2d 649 (1948):

> The general rule is that the question whether the relation of the parties is that of landlord and tenant, landowner and cropper, participants in a common venture, or some other relationship must turn upon the actual intention of the parties as gathered from the entire contract, the language in which it is cast, and the circumstances surrounding its execution. If the import of the agreement is doubtful, the actions of the parties to it may furnish a satisfactory guide for its interpretation.

*Id.* 226 Minn. at 318–19, 32 N.W.2d at 651, (quoting 15 Am.Jur., *Crops*, § 48).

We approach any suggestion that a sharecrop arrangement is not one of landlord and tenant with caution. We recognize that there are a variety of arrangements which constitute a landlord-tenant relationship. This is particularly true in sharecropping. For example, it would not be unusual for a landlord and tenant to devise an arrangement which would bring the landlord onto the premises on a number of occasions.

Here, however, Porter Farms reserved a measure of authority not normally held by a landlord. Not only did Sorenson not have exclusive possession of the dairy operation, but Porter Farms retained decision-making authority over the operation. Tom Tomlinson repeatedly testified that Porter Farms had the final say in all decisions involved in running the operation. Another Porter Farms operator planted the crops and, when Sorenson got behind, Porter Farms hired a baler to help with the harvest.

There was no agreement for a fixed term. Porter Farms maintained that it could terminate Sorenson any time if there were problems. Sorenson did not maintain otherwise and felt that he could leave at any time.

While the facts do not support Porter Farms' contention that the relationship between it and Sorenson was one of landlord and tenant, substantial evidence does support the administrative law judge's conclusion that the relationship was one of employer-employee. The factors to be considered in determining the existence of an employment relationship are:

(1) The right to control the means and manner of performance;

(2) The mode of payment;

(3) The furnishing of material or tools;

(4) The control of the premises where the work is done; and

(5) The right of the employer to discharge.

*Wangen v. City of Fountain*, 255 N.W.2d 813, 815 (Minn.1977) (citations omitted). "The most important of these factors is the right to control the means and manner of performance." *Id.* Tom Tomlinson stated that he had the final say in the management of the dairy operation and that Porter Farms could "terminate" Sorenson if Sorenson's views were not compatible with Porter Farms. Porter Farms also retained control of the premises. It maintained the buildings and the dairy parlor; it hired other people to work on the dairy operation; and it retained control of the decision making which related to the premises. Sorenson received wages for caring for the herd and harvesting in addition to a rent-free house, and a share of the crop. *See Minneapolis Iron Store Co. v. Branum*, 36 N.D. 355, 162 N.W. 543 (1917). While Sorenson did supply some of his tools and material, this factor does not weigh heavily against those which support the conclusion that Porter Farms and Sorenson had an employer-employee relationship.

Given this court's affirmation of the administrative law judge's conclusion that the relationship between Porter Farms and Sorenson is one of employer-employee, Porter Farms does not question the administrative law judge's determination that Porter Farms is liable for Sorenson's termination of Fitzloff.

## V.

### Domestic Servant

■ Sorenson argues that because Fitzloff was a domestic servant he is not protected by the Human Rights Act. The administrative law judge concluded that the "domestic service" exemption contained in Minn.Stat. § 363.02, subd. 1(1)(b) (1984) does not apply to Fitzloff. Subdivision one states:

The provisions of section 363.03, subdivision 1, shall not apply to:

(1) The employment of any individual

\* \* \* \* \* \*

(b) in the domestic service of any person

We agree. There is no definition of "domestic service" in the Human Rights Act, however the supreme court has defined the

term for the purpose of the Minnesota Workers' Compensation Act:

> [W]e have no alternative but to construe the phrase "domestic servant" as meaning those whose activities and efforts are directed toward the care and maintenance of a home * * *.

*Anderson v. Ueland,* 197 Minn. 518, 522, 267 N.W. 517, 519 (1936). This definition does not include agricultural workers. There is no evidence that Fitzloff cared for or maintained Sorenson's home. All the evidence supports the findings that he cared for the dairy herd. The location of Fitzloff's cottage close to Sorenson's home was mere happenstance and for the benefit of Fitzloff's access to the dairy herd and not related to any reason for Fitzloff to live next to Sorenson's home for purposes of working in that home. We conclude Fitzloff is protected by the Human Rights Act.

## VI.

### *Damages*

The administrative law judge ordered Sorenson and Porter Farms to pay Fitzloff $7,226, compensatory damages for lost wages and benefits. The total is calculated by multiplying the time unemployed, eight months, by the total monthly value of lost wages and benefits, minus some miscellaneous earnings. The monthly wages and benefits include $500 for salary, $80 for overtime, $250 for free lodging, $75 for free utilities, and $50 for free meat and dairy products.

Sorenson and Porter Farms contended the benefit figures are not supported by substantial evidence. They argue damages should have stopped accumulating when Fitzloff obtained employment with Fairmont Refrigerated, that Fitzloff suffered no out-of-pocket losses for the fringe benefits because his parents provided them, and that the order fails to give credit for excess wages earned by Fitzloff during the damage period.

■ "[T]he award of damages is committed to the [administrative law judge's] sound discretion and may be modified only if arbitrary and capricious or if unsupported by substantial evidence on the record as a whole." *Continental Can Co. Inc. v. State,* 297 N.W.2d 241, 251 (Minn. 1980) (citation omitted). Substantial evidence is:

1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;
2. More than a scintilla of evidence;
3. More than some evidence;
4. More than any evidence; and
5. Evidence considered in its entirety.

*Cable Communications Bd. v. Nor-west Cable,* 356 N.W.2d 658, 668 (Minn.1984). We agree with Porter Farms and Sorenson that the administrative law judge's findings with regard to the value of the fringe benefits is not supported by substantial evidence. Fitzloff estimated the rental value of the trailer and admitted his estimate was "just speculation." He based his opinion on what friends had told him was the purchase price of a trailer and did not know if the ages of the trailers were similar. Other testimony discredited Fitzloff's estimate. Fitzloff's estimate constitutes some evidence but the evidence considered in its entirety is not substantial.

Similarly, Fitzloff's estimate of the value of the utilities, butter and meat constitute some evidence but no more. Therefore, the damages should have been calculated on the basis of $580 per month instead of $955 per month. We modify the damage award downward $3,000 representing a deduction of $375 per month for the eight months in question.

■ The administrative law judge did not include damages for the periods when Fitzloff was employed. He determined that Fitzloff's acceptance of employment with Fairmont Refrigerated did not cut off Fitzloff's rights to damages for any subsequent periods of unemployment or layoffs. The administrative law judge reasoned that to do otherwise would discourage victims of discrimination from accepting full time employment whenever the duration of that employment was dubious. By accepting employment with Fairmont Refrigerated

and by looking for work during his period of unemployment, Fitzloff did all that could reasonably be expected of him by way of mitigation. *See Brady v. Thurston Motor Lines,* 753 F.2d 1269, 1275 (4th Cir.1985). We concur with the administrative law judge's determination.

The administrative law judge did not set off excessive wages earned while Fitzloff was employed because the issue was specifically discussed in the record and Fitzloff's testimony on the subject was excluded upon objection and assurance that set offs would not be requested. Under the circumstances, the decision not to set off was correct.

■ Porter Farms also argues that after January 1, 1984, Fitzloff's position would have been discontinued, and thus damage calculation, if any, should stop there. This argument is rebutted by the fact that Porter Farms continued to employ part-time help after January 1st to do what Fitzloff had previously done. The administrative law judge's decision is supported by substantial evidence.

■ The administrative law judge concluded that Fitzloff lost $500 on the truck he bought solely on Sorenson's suggestion. Fitzloff would not have bought the truck if Sorenson had not requested it and he had no use for it after the discharge. This item of damages is arguable, but not arbitrary and capricious, and is supported by substantial evidence.

■ The Human Rights Act § 363.071, subd. 2 (1984) provides for the award of attorney fees. The administrative law judge characterized the claim for attorney fees as modest and reasonable. We agree and find there was no abuse of discretion in awarding them.

■ The Human Rights Act § 363.071, subd. 2 also provides for the award of damages for mental anguish. The findings regarding mental anguish are there and support the award of $500. Substantial evidence supports the findings.

Less than 24 hours before the hearing the Commissioner moved to amend the notice of and order for hearing to increase the request for damages for mental anguish from $500 to $5,000. The administrative law judge denied the motion finding it was untimely and that the Commissioner had failed to request a continuance of the hearing which would have afforded Sorenson and Porter Farms adequate time to prepare to respond. We find no abuse of discretion.

■ Minn.Stat. § 363.071, subd. 2 also authorizes punitive damages but requires that these damages be awarded pursuant to Minn.Stat. § 549.20 (1984). Subdivision one of this statute provides:

Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

Minn.Stat. § 549.20, subd. 1 (1984). In making the award the administrative judge considered Fitzloff's warning to Sorenson that his discriminatory action was unlawful and Sorenson's decision to ignore the warning. We find no abuse of discretion. At oral argument the State withdrew its earlier request for civil damages.

## VII.

*Timeliness*

Porter Farms contends that the claim against it should be barred by Minn.Stat. § 363.06, subd. 3 (1982) which states that a claim of unfair discriminatory practice must be brought within 300 days after the occurrence of the practice.

■ Porter Farms raises the issue for the first time on appeal. In fact, at the beginning of the hearing it agreed that all procedural and jurisdictional requirements had been met. In any event since Sorenson is a manager for Porter Farms, notice to Sorenson is notice to Porter Farms. *See Baldinger Baking Co. v. Stepan,* 354 N.W.2d 569 (Minn.1985).

## DECISION

Substantial evidence supports the conclusion that Randy Fitzloff did not quit but was terminated by James Sorenson. The Human Rights Act, Minn.Stat. § 363.01 et seq., is not unconstitutional as applied to Sorenson. The relationship between Porter Farms and Sorenson is not one of landlord and tenant. Substantial evidence supports the administrative law judge's conclusion that the relationship between Sorenson and Porter Farms is one of employer-employee. Fitzloff was not employed as a domestic servant. The award of damages is affirmed as modified. Fitzloff's claim against Porter Farms is not barred by Minn.Stat. § 363.06, subd. 3.

Affirmed as modified.