Mary LaMOTT, Respondent,

v.

**APPLE VALLEY HEALTH CARE CENTER, INC., Appellant.**

No. C5-90-1436.

Court of Appeals of Minnesota.

Jan. 29, 1991.

Richard P. Clem, Clem & Crosby, Minneapolis, for respondent.

Howard A. Knutson, Knutson, Ilstrup & Knutson, Burnsville, for appellant.

Considered and decided by HUSPENI, P.J., CRIPPEN and KALITOWSKI, JJ.

## OPINION

HUSPENI, Judge.

Appellant challenges the trial court's finding that it committed a discriminatory practice by failing to provide respondent reasonable accommodation to assist her return to work. We affirm.

## FACTS

Respondent Mary LaMott worked as a housekeeper and laundry worker at appellant Apple Valley Health Care, Inc. between October 1984 and June 1987. In April 1986, respondent suffered a severe cerebral hemorrhage resulting from an aneurysm, lapsed into a coma and suffered paralysis. Following a near miraculous recovery, respondent began rehabilitation at Sister Kenny Institute in Minneapolis.

As a result of the aneurysm, respondent suffered "cognitive deficits including problems with visual orientation and verbal memory," experiencing particular difficulty with short-term memory. In order to cope with the memory deficiency, respondent learned to use "memory logs" (i.e., checklists) to assist her in completing routine tasks such as housework.

Appellant placed respondent on a five month leave of absence from her job while she convalesced in the hospital. Beginning in July 1986, respondent began contacting appellant regarding returning to her job after completing rehabilitation. The parties began meeting in the fall of 1986 to evaluate whether to reinstate respondent's

employment. At the meetings, appellant expressed concern regarding respondent's ability to safely do her job. Management suggested employment in either the laundry or dietary department because of the limited patient contact and enhanced supervision.

On September 15, 1986, Dr. Jennine Speier wrote to the nursing home administrator regarding respondent's condition. The letter states in relevant part:

[A] patient such as [respondent] does function quite well in a familiar setting and she has been able to carry on many of her normal household activities. It is my opinion that [respondent] will be able to cope with working with light housekeeping at the nursing home where she has worked previously. These tasks are familiar to her as is the lay-out of the nursing home. She may need more re-direction to her task, lists of written instructions, and somewhat closer supervision but I do think she should be able to perform the tasks as described by [respondent's husband].

The doctor sent a follow-up letter on January 14, 1987 that stated in part:

[Respondent] has continued to improve in all areas. She is completely physically independent and doing full household activities. She has also shown improvement in her memory, insight and compensatory strategies. She does particularly well in a familiar setting. At the present time I think she would be suitable to return to work in the nursing home environment, particularly in the familiar portion of the nursing home.

As part of respondent's process of returning to work, Mary Harris of the Minnesota Department of Vocational Rehabilitation recommended that respondent undergo vocational testing to determine her ability to be a housekeeper. Respondent submitted to evaluation at Owobopte, a rehabilitation consultant facility. She also received training on "work hardening" to build her job endurance (i.e. ability to cope with a full-time job).

On May 27, 1987, respondent returned to work on a trial basis to determine whether she was able to function as a housekeeper. Appellant paid respondent $4.00 per hour (over two dollars less per hour than she had previously been paid) and classified her as an independent contractor. Appellant did not inform respondent of her independent contractor status until her paycheck was not issued with those of other employees. Appellant assigned respondent to clean the apartments (the villa) connected to the nursing home. The work consisted of cleaning essentially vacant, recently constructed units. Respondent had never worked in the apartments before her aneurysm.

Respondent worked with a job coach during the probationary period. The coach did not do respondent's work, but rather supervised and critiqued her efforts. Based on her observations, the job coach testified that respondent was fully capable of acting as a housekeeper if she used her memory log and worked with another housekeeper. In her opinion, the additional housekeeper would be necessary for one to two years. The job coach testified that respondent no longer needed her services at the end of the two week probationary term.

Appellant extended the original one week probationary period to three weeks. During this period, appellant paid respondent the lower rate of pay and did not provide regular employee benefits.

Appellant criticized respondent's work in the apartments as substandard and on one occasion stated that the rooms would have to be redone. In response to this criticism, respondent's husband asked to see the rooms that were unsatisfactory. Respondent's supervisor showed him examples including "carpet crumbs" (small carpet fragments) underneath the baseboard heaters, dirt underneath the vegetable tray in the refrigerator, and ice cube trays that were taped inside the new refrigerators. Appellant did not provide specific guidance on how to clean the new apartments. Appellant never scheduled respondent to work in the nursing home during the probationary period. Respondent terminated her independent contractor status on June 12, 1987 (at the end of two weeks) after learn-

ing that she would continue to work at the lower rate of pay in the villa.

Following a two day trial, the trial court found disability discrimination and awarded respondent compensatory damages reflecting lost wages.

### ISSUES

1. Did the trial court err by finding disability discrimination based on failure to make a reasonable accommodation?

2. Did the trial court err by failing to award treble or punitive damages?

### ANALYSIS

#### I.

On review, this court will not disturb the trial court's findings of fact if they are "reasonably supported by the evidence in the record considered as a whole." *Shea v. Hanna Min. Co.*, 397 N.W.2d 362, 367 (Minn.App.1986) (citing *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 441 (Minn.1983)). "Findings made by a court sitting without a jury must be upheld unless clearly erroneous." *Id.;* Minn.R.Civ.P. 52.01.

The Minnesota Human Rights Act (Minn. Stat. § 363.01–.14) (the Act) prohibits employment discrimination based on physical or mental disability. The Act defines disability to mean:

> any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

Minn.Stat. § 363.01, subd. 25 (1986). 29 U.S.C. § 794 also provides:

> No otherwise qualified handicapped individual * * * shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any pro-

gram or activity receiving Federal financial assistance.

Minn.Stat. § 363.03, subd. 1(6) (1986) provides that it is an unfair employment practice:

> For an employer with 50 or more permanent full-time employees * * * not to make reasonable accommodations to the known disability of a qualified disabled person [1] unless the employer * * * can demonstrate that the accommodation would impose an undue hardship on the business.

The act defines reasonable accommodation as "steps which must be taken to accommodate the known physical or mental limitations of a qualified disabled person." *Id.* The statute provides a non-exclusive list of types of accommodations, including:

> job restructuring, modified work schedules, * * * acquisitions or modifications of equipment or devices, and the provision of aids on a temporary or periodic basis.

*Id.*

In *Danz v. Jones*, 263 N.W.2d 395, 399 (Minn.1978), the Minnesota Supreme Court adopted the discrimination analysis applied by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

> The *McDonnell Douglas* analysis consists of a prima facie case, an answer, and a rebuttal. First, the plaintiff must present a prima facie case of discrimination by a preponderance of the evidence. This requires the plaintiff to present proof of discriminatory motive. A prima facie case may be established by direct evidence of discriminatory motive, such as where an employer announces he will not consider females for positions. For those cases in which such direct evidence is not available, the Supreme Court, in *McDonnell Douglas*, articulated an alternative means by which discriminatory motive can be inferred. The specific elements of the *McDonnell Douglas* court's

---

**1.** "Qualified disabled person" means:
(1) with respect to employment, a disabled person who, with reasonable accommodation,

can perform the essential functions required of all applicants for the job in question.
Minn.Stat. § 363.01, subd. 25a (1986).

formulation of the plaintiff's prima facie case, however, must be modified for varying factual patterns and employment contexts.

*Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986) (citations omitted).

### A. Prima facie case

■ Respondent argues that appellant's off-duty accident policy constitutes direct evidence of discrimination. We agree. The provision states:

> Employees involved in off-duty accidents resulting in physical restrictions, such as lifting, may not return to work until they have a return to work slip from a physician. * * * *The employee will not be allowed to return to work until no physical restrictions exist.*

(Emphasis added). The emphasized language shows a clear intent to exclude disabled persons from the work place.

■ Because we have determined that respondent has presented a direct prima facie case of discrimination, we need not consider evidence of indirect discrimination, *State by Cooper v. Hennepin County,* 441 N.W.2d 106, 110 n. 1 (Minn.1989). Nonetheless, we note that respondent also established an indirect prima facie case of discrimination, wherein a plaintiff must show that:

> (1) she is a member of a protected class;
>
> (2) she sought and qualified for opportunities that the employer made available to others;
>
> (3) that although qualified she was denied the opportunities; and
>
> (4) after denial, the opportunities remained available to others with plaintiff's qualifications.

*Sigurdson,* 386 N.W.2d at 720 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824); *see State by Khalifa v. Hennepin County,* 420 N.W.2d 634, 639–40 (Minn.App.1988), *pet. for rev. · denied* (Minn. May 4, 1988).

### (1) *Member of a protected class*

The parties do not dispute that respondent is disabled and therefore a member of a protected class. *See* Minn.Stat. § 363.03, subd. 1(2) (1986).

### (2) *Qualified for the position*

■ Respondent "needs only show that [s]he met the minimum objective qualification of the job." *Khalifa,* 420 N.W.2d at 640. Before the aneurysm, respondent worked as a housekeeper and a laundry worker at the nursing home. The job descriptions admitted at trial show minimal job qualifications.[2] Respondent also introduced two letters from her physician that stated that respondent was able to return to work as a housekeeper. The first letter explained that "[s]he may need more re-direction to her task, lists of written instructions, and somewhat closer supervision but I do think she should be able to perform the tasks as described by [respondent's husband]." Respondent's job coach testified that respondent completed her tasks 50% of the time when using a "memory log" or checklist and completed 100% of the tasks using a combination of the memory log and personal supervision. The job coach recommended that respondent work with another housekeeper to fully complete her tasks (i.e. two housekeepers clean two floors together, rather than one housekeeper clean one floor alone). Based on the testimony, we find that the evidence showed that with reasonable accommodation, respondent had the ability to "perform the essential functions required of all applicants for the job." Minn.Stat. § 363.01, subd. 25a.

### (3) *Denied opportunities that remained open*

Respondent presented evidence that showed that the nursing home hired others to work in the housekeeping department during the period respondent was seeking employment.

---

**2.** In the case of the housekeeper position, the job requires the "[a]bility to read, speak, write, and follow simple oral and written directions." Although some housekeeping experience was desirable it was not necessary. Further, the employee "[m]ust know how to use common housecleaning devices, and scouring pads to keep assigned area clean and well-serviced."

### B. Answer

█ Once respondent established the prima facie case, the burden shifted to appellant to show a non-discriminatory reason for the disparate treatment.

█ First, appellant argues that respondent posed a threat to the vulnerable adults living at the nursing home due to her memory loss. Minn.Stat. § 363.02, subd. 5 (1986) provides:

It is a defense to a complaint or action brought under [the employment provisions of] this chapter that the person bringing the complaint or action has a disability which in the circumstances and even with reasonable accommodation, as defined in section 363.03, subdivision 1, clause (6), poses a *serious threat to the health or safety of the disabled person or others*. The burden of proving this defense is upon the [appellant].

(Emphasis added). In support of its argument, appellant cites Minnesota Rule 4655.-2600 which provides:

Every employee shall be mentally and physically capable of performing the work to which assigned, in good health, free from colds and other communicable diseases.

In order to establish the "serious threat" defense, however, the employer generally must prove that it relied on "competent medical advice" and that the employer proved a "reasonably probable risk of serious harm." *Lewis v. Remmele Eng'g, Inc.*, 314 N.W.2d 1, 4 (Minn.1981). In this case, appellant did not produce any medical testimony or evidence that showed "a reasonably probable risk of serious harm." Respondent presented the only medical opinion in the record. Two letters written by respondent's physician stated that respondent was capable of returning to work as a housekeeper. Appellant, in its reply brief, raises a psychologist's report dated June 27, 1987 that was not admitted into evidence.[3]

Appellant presented testimony regarding one instance of respondent temporarily forgetting to put a cleaning solution away during the Owobopte center training. Respondent, however, returned and put the product away of her own volition a short time later. We note that respondent worked as a housekeeper; she did not provide patient care. Understandably, a *health care provider* must be physically and mentally able to perform the tasks without the threat of injury to the patient. In the case of a housekeeper, however, the trial court did not err by rejecting appellant's "serious injury" defense.

Appellant next contends that the accommodations necessary to employ respondent created an undue hardship. Minn.Stat. § 363.03, subd. 1(6) provides that:

In determining whether an accommodation would impose an undue hardship on the operation of a business or organization, factors to be considered include:

(a) the overall size of the business or organization with respect to number of employees or members and the number and type of facilities;

(b) the type of the operation, including the composition and structure of the work force, and the number of employees at the location where the employment would occur;

(c) the nature and cost of the needed accommodation;

(d) the reasonable ability to finance the accommodation at each site of business; and

(e) documented good faith efforts to explore less restrictive or less expensive alternatives, including consultation with the disabled person or with knowledgeable disabled persons or organizations.[4]

**3.** The court allowed the state rehabilitation specialist to testify regarding the actions she took as a result of reading the report, but excluded the report itself. The specialist testified that she recommended that respondent not be placed in situations where vulnerable persons were present. The record is silent as to whether the recommendation would have been the same in a "team work" setting. Moreover, the examination upon which the report is based took place several weeks after respondent left the nursing home.

**4.** The statute further provides that for job applicants, a prospective employer need only spend up to $50 to accommodate the applicant's dis-

Appellant argues that implementing the team cleaning approach recommended by the job coach would be cost prohibitive because a second full-time housekeeper would be necessary at an approximate annual cost of $18,928. We cannot agree. Contrary to appellant's interpretation of the team cleaning recommendation, respondent's co-worker would not do respondent's work. Rather, the plan required restructuring the schedule so that two housekeepers worked together on the floor and when the tasks were completed on that floor, they would move to a second floor. Moreover, the job coach testified that the aid of a second worker would be necessary for one to two years. Under the facts of this case, we agree with the trial court's determination that "[appellant's] position that a team cleaning approach is cost prohibitive and impossible to implement is unreasonable."

The goal of the disability discrimination statute is to facilitate the return of disabled persons into the work force. Indeed, Minn.Stat. § 363.03, subd. 1(6)(b) contemplates providing job restructuring and aids for disabled workers. Minnesota's disabled citizens are an untapped resource that is willing and able, with assistance from employers and the state, to make a productive contribution to our society. The record clearly shows that appellant failed to make a reasonable accommodation to facilitate respondent's return to the work place.

## II.

Respondent argues that the trial court erred by failing to award treble or punitive damages. We disagree. Contrary to respondent's implication in the brief, *State by Johnson v. Porter Farms, Inc.*, 382 N.W.2d 543, 551 (Minn.App.1986), does not stand for the proposition that the court must award additional damages, but merely that the trial court has discretion to do so. *Id.* Moreover, the record does not support a finding of "willful indifference to the right or safety of others" as required

under the punitive damage statute. Minn. Stat. § 549.20, subd. 1 (1986). We conclude that the trial court did not abuse its discretion by awarding only compensatory damages. We similarly reject appellant's attorney fees challenge.

## DECISION

Appellant failed to provide adequate accommodation to respondent to allow her to return to her housekeeping position. The trial court's findings and judgment are supported by the record and consistent with applicable law.

Affirmed.

ability. *Id.* The limitation does not apply to returning employees. The legislature repealed

the $50 limitation in 1987. 1987 Minn.Laws, ch. 129, § 3.