**STATE OF MINNESOTA, DEPART-MENT OF HUMAN RIGHTS, Respondent (C3–91–1798), Relator (C1–91–1816),**

v.

**HIBBING TACONITE COMPANY, Relator (C3–91–1798), Respondent (C1–91–1816).**

Nos. C3–91–1798, C1–91–1816.

Court of Appeals of Minnesota.

March 17, 1992.

Review Denied May 15, 1992.

Raymond L. Erickson, Richard J. Leighton, Hanft, Fride, O'Brien, Harries, Swelbar & Burns, P.A., Duluth, for Hibbing Taconite Co., relator (C3–91–1798), respondent (C1–91–1816).

Hubert H. Humphrey, III, Atty. Gen., Richard L. Varco, Jr., Asst. Atty. Gen., St. Paul, for State of Minn., Dept. of Human Rights, respondent (C3–91–1798), relator (C1–91–1816).

Considered and decided by FORSBERG, P.J., and KLAPHAKE and DAVIES, JJ.

## OPINION

FORSBERG, Judge.

In 1983, respondent State of Minnesota, Department of Human Rights ("Department") brought this class action against relator Hibbing Taconite Company ("Hibbing Taconite"), alleging discrimination on the basis of disability. In a decision issued August 16, 1991, an administrative law judge ("ALJ") concluded class certification is appropriate here; the pre–1983 disability provisions of the Minnesota Human Rights Act ("Act") are not unconstitutionally overbroad or void for vagueness; all of the claimants are disabled within the meaning of the Act; Hibbing Taconite was not denied due process by the Department's failure to promulgate rules defining the term "disability"; Hibbing Taconite unlawfully discriminated against the claimants on the basis of disability; and compensatory damages in the form of back pay were appropriate.

Both parties appeal.

## FACTS

In 1973, the legislature amended the Act to make it unlawful to discriminate in employment on the basis of disability. *See* 1973 Minn. Laws ch. 729, § 3 (amending Minn.Stat. § 363.03, subd. 1(2)). The legislature defined "disability" as "a mental or physical condition which constitutes a handicap." 1973 Minn. Laws ch. 729, § 1 (adding Minn.Stat. § 363.01, subd. 25). This definition of disability remained in effect until 1983, when it was amended to include, among other things, perceived physical or mental impairments. *See* 1983 Minn. Laws ch. 276, § 1.

Following the 1973 legislative action, Hibbing Taconite was unsure how to comply with the prohibition against disability discrimination. Applicants for laborer positions at Hibbing Taconite were required to undergo a pre-employment physical examination. The duties of a laborer included cleaning heavy equipment, working in excavated pits, shoveling ores in weights of up to 135 pounds, and performing other heavy, physically demanding work. The position

often involved repetitive, strenuous activities which were performed in cold weather or on irregular surfaces. Back injuries were a recurrent and serious problem at Hibbing Taconite.

Staff doctors from the Mesaba Clinic in Hibbing, Minnesota, were hired to examine the workplace, become familiar with the types of work required of a laborer, develop qualifications for the position, and perform the pre-employment physicals. Hibbing Taconite relied upon the medical judgment of the doctors and uniformly followed the recommendation of the doctor performing the examination.

Between 1976 and 1982, the pre-employment physical provided for the rejection and disqualification of applicants with certain conditions including a "history of back pathology or other disabling back conditions which could be aggravated as determined by medical findings." Based on radiologists' reports of back x-rays taken during the physical, the doctors performing the physicals placed applicants in one of four categories or classes. Applicants placed in category A or B could be employed without restriction. Those placed in category C were employable, but with restriction. Applicants placed in category D were individuals who had "defects listed [in category C] that cannot be corrected and make it inadvisable to employ them under any circumstances." Back conditions meriting a C classification were

> spondylolysis, spondylolisthesis, transitional lumbosacral vertebra having transverse process articulations with the ala [sic] of the sacrum, thin intervertebral disc spaces at the L4–5 lumbosacral level and marked general hypertrophic degenerative changes in the upper spine, or moderate if at the L4, L5 or S1 level.

The charging parties or class members in this case, hereafter referred to as "claimants," were all rejected from employment at Hibbing Taconite after being placed in category D.

After receiving the charges in this case, Hibbing Taconite again consulted with the doctors at the Mesaba Clinic regarding the appropriateness of using back x-rays as a predictive component in the pre-employment physical examination. Based on the advice of the doctors, Hibbing Taconite decided to continue using back x-rays to disqualify certain applicants from employment.

## ISSUE

Did the ALJ apply an erroneous standard in determining that Hibbing Taconite failed to establish a "serious threat" defense?

## ANALYSIS

■ This court may reverse or modify an ALJ's decision if it is in violation of constitutional provisions, in excess of an agency's statutory authority or jurisdiction, unsupported by substantial evidence, arbitrary or capricious, or affected by an error of law. Minn.Stat. § 14.69 (1982). An ALJ's decision may be reversed if unsupported by substantial evidence in view of the record as a whole. *In re Wang,* 441 N.W.2d 488, 492 (Minn.1989).

■ Initially, we must determine whether the ALJ properly certified this as a class action. *See* Minn.R. 5000.1100 (1983). The Department has shown that Hibbing Taconite uniformly applied medical standards to disqualify applicants with certain low back anomalies diagnosed by x-ray. Where issues of liability and any defenses to that liability are common, any factual differences in the claimants' medical conditions or in the determination of damages will not preclude class certification. *See State by McClure v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 854 (Minn.1985) (despite individual differences regarding allegations of charging parties, class certification proper when same theory of liability asserted against employer). We therefore conclude class certification was appropriate, and our decision here is applicable to the entire class.

For the purposes of this opinion, it will be assumed that each claimant established that he or she was disabled within the meaning of the Act, and that each made a prima facie case of disability discrimination. *See State by Cooper v. Hennepin*

*County*, 441 N.W.2d 106, 110 n. 1 (Minn. 1989). The burden then shifted to Hibbing Taconite to prove its decisions not to hire the claimants were justified as a "bona fide occupational qualification" ("BFOQ") or as a "serious threat." *See* Minn.Stat. §§ 363.-03, subd. 1(2) and 363.02, subd. 5 (1982).

■■■ The proof required to meet each defense varies. To prove a medical condition constitutes a BFOQ, an employer must show that all or substantially all persons afflicted with the condition are unable to safely and efficiently perform the responsibilities of the position. *Lewis v. Remmele Eng'g, Inc.*, 314 N.W.2d 1, 3 (Minn.1981). It is clear that the facts of this case do not support a BFOQ defense: Hibbing Taconite has not shown, and does not really allege, that all or substantially all individuals with low back anomalies are unable to perform the duties required of a laborer.

■■■ The dispute centers around whether Hibbing Taconite has shown that individuals with these low back anomalies pose a serious threat to themselves or to co-workers. Minn.Stat. § 363.02, subd. 5 (1982) provides in pertinent part:

> It is a defense to a complaint or action brought under this chapter that the person bringing the complaint or action suffers from a disability which in the circumstances poses a serious threat to the health or safety of the disabled person or others. The burden of proving this defense is upon the respondent.

To prove a condition constitutes a serious threat, an employer must show "it relied upon competent medical advice that there exists a reasonably probable risk of serious harm." *Remmele Eng'g*, 314 N.W.2d at 4 (citing *Chicago & N.W. R.R. v. Labor & Indus. Review Comm'n*, 91 Wis.2d 462, 283 N.W.2d 603 (App.1979)).

In *Chicago & N.W. R.R.*, the employer refused to rehire an epileptic individual as a welder. In affirming an agency's conclusion that the employer failed to prove a "future hazards" exception, which somewhat parallels Minnesota's serious threat defense, the Wisconsin appellate court discussed the meaning of the term "reasonably probable." *Id.* at 608. It is not, how-ever, the source of the exact standard set out by the Minnesota Supreme Court in *Remmele Eng'g*. *See also Bucyrus–Erie Co. v. State, Dep't of Indus., Labor & Human Relations*, 280 N.W.2d 142, 150 (Wis.1979) (although employer's refusal to hire individual as a welder based on pre-employment physical examination disclosing three congenital back defects, Wisconsin Supreme Court nevertheless affirmed agency's finding of discrimination and rejection of "future hazards" exception).

While these Wisconsin cases place a heavy burden on employers, Minnesota courts have tended not to require such exacting evidence from employers in order to establish a serious threat defense. Employers in Minnesota who have asserted the serious threat defense have generally been successful, and have had little difficulty proving they relied upon competent medical advice that there existed a reasonably probable risk of serious harm. *See, e.g., Remmele Eng'g*, 314 N.W.2d at 4 (affirming trial court's determination that employer sustained burden of establishing employee's epilepsy posed serious threat while employed as machinist); *Lewis v. Metropolitan Transit Comm'n*, 320 N.W.2d 426, 429–30 (Minn.1982) (affirming trial court's finding that visually impaired employee posed serious threat as bus driver); *Khalifa v. G.X. Corp.*, 408 N.W.2d 221, 225 (Minn.App.1987) (record supported serious threat defense to employer's decision to place pregnant hairstylist on medical leave); *Pearson Candy Co. v. Huyen*, 386 N.W.2d 253, 257 (Minn.App.1986) (affirming district court's overturning of decision by city commission that employer failed to establish serious threat defense to justify its decision not to hire epileptic individual as assembly line worker); *State by Gomez-Bethke v. Metropolitan Airport Comm'n*, 358 N.W.2d 432, 434–35 (Minn. App.1984) (affirming hearing examiner's determination that applicant's lower back condition posed serious threat if employed as building service worker). In the one case which affirmed an ALJ's rejection of an employer's serious threat defense, this court emphasized that the employer had

failed to produce *any* medical testimony or evidence in support of its defense. *See LaMott v. Apple Valley Health Care Ctr., Inc.*, 465 N.W.2d 585, 590 (Minn.App.1991).

To sustain its burden, Hibbing Taconite presented the testimony of two family practice doctors from the Mesaba Clinic who developed and performed the pre-employment physicals. Each testified they frequently diagnosed and treated patients with back injuries. Each doctor toured the mine sites and was familiar with the nature of the work.

Each doctor testified that with respect to the low back anomalies at issue, it was more probable than not that an applicant with that condition would suffer a back injury if he or she engaged in strenuous physical labor. The experts characterized potential injuries as serious, ranging from low back pain to incontinence and impotence. Each doctor's opinion was based on the premise that the low back anomalies at issue constitute spinal weaknesses and predispose an individual to a range of injuries if he or she engages in heavy manual labor. Finally, each stated his opinions were based on his experience, education, and training, were consistent with those generally held by the medical community, and were stated to a reasonable degree of medical certainty.

The Department's experts were board certified orthopedic surgeons who had not toured Hibbing Taconite's facilities, and who did not treat or perform pre-employment physicals on individuals engaged in heavy manual labor. They testified that absent symptoms, there is no correlation between suffering a back injury from manual labor and having any of the anomalies at issue here. They further stated that x-ray findings alone cannot determine whether an individual should engage in heavy manual labor, and an individual's history and physical examination must also be considered.

The Department argues the quality of the medical advice received by Hibbing Taconite was flawed because it was contradicted by the Department's experts who were better qualified, and whose testimony was given more weight by the ALJ. However, this does not necessarily mean that Hibbing Taconite's experts were not competent to give advice on this subject.

■ "Competent" means "[d]uly qualified." *Black's Law Dictionary* 257 (5th ed. 1979). To be considered competent to testify on a particular subject, a medical expert must have theoretical expertise as well as practical knowledge or experience of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant. *Lundgren v. Eustermann*, 370 N.W.2d 877, 880–81 (Minn.1985).

The Department further argues Hibbing Taconite has not met its burden of proof because it disqualified individuals from employment on the basis of incomplete medical information. The Department's experts testified it is generally accepted medical practice to obtain and utilize information regarding not only back pain, but also an individual's previous work history and non-job related activities when making a determination as to how much weight an individual should lift, or the type of physical activity to undertake. While the pre-employment physical did include a medical history, Hibbing Taconite's experts suggested they did not consider applicants' medical history when determining whether they should be disqualified from employment mainly because applicants for employment may be motivated to minimize or even conceal physical problems. Reliance on x-rays to detect low back abnormalities and screen potential problems has been considered acceptable by other courts. *See State by Gomez–Bethke*, 358 N.W.2d at 434 (affirming agency's decision to accept expert's opinion which was based on back x-rays); *Smith v. Olin Chem. Corp.*, 555 F.2d 1283, 1287 (5th Cir.1977) (x-rays of the low back have become routine part of pre-employment physical examination in many occupations, and may form basis for precluding hiring of persons with pre-existing conditions). Again, the question is whether the medical advice Hibbing Taconite received was competent, not whether it was the most credible advice.

It is clear that the ALJ assumed Hibbing Taconite had to meet a much more stringent standard than required by Minnesota case law or statute. While the ALJ acknowledged there is no way to accurately predict an applicant's chances of injury or type of injury, it nevertheless would require an employer to follow what it has determined to be the most predictive method: consideration of not only x-rays but also an individual's past medical and employment history. However, the Department should not be allowed to second guess an employer's decision to rely upon competent medical advice by presenting consultants whom an ALJ may find to be more credible than the employer's.

Finally, the ALJ failed to examine the reliance aspect of the serious threat defense. Hibbing Taconite's reliance on the advice of the doctors from the Mesaba Clinic was not "categorical" or otherwise unquestioning. *See Bucyrus–Erie,* 280 N.W.2d at 150 (employer cannot justify discrimination by "categorically" relying upon opinion of company doctor). Hibbing Taconite consulted with the doctors at the Mesaba Clinic on a regular basis regarding the appropriateness of its pre-employment physical examination and disqualifying conditions.

█ An employer who has relied upon competent medical advice that there existed a reasonably probable risk of serious harm should be allowed some discretion in determining whether an individual should be disqualified from employment. An employer need not establish to a certainty that its decision was sound. If an employer errs at all, it should be allowed to err on the side of safety. We do not believe the legislature, when enacting its prohibition against disability discrimination, intended to force an employer into creating a situation potentially injurious to employees or others.

We therefore conclude the ALJ erred in determining Hibbing Taconite failed to sustain a serious threat defense. Because we reverse the ALJ's decision on this ground, we need not discuss the other issues raised by the parties.

## DECISION

The ALJ's determination that Hibbing Taconite failed to prove a serious threat defense is reversed. Hibbing Taconite met its burden, and this class action must be dismissed.

Reversed.

DAVIES, Judge (concurring specially).

While I fully concur with the majority opinion, I would add that the claimants in this case have not proved they are "disabled." I would reverse the ALJ's decision on this additional basis as well.

Statutory words and phrases are to be given "their common and approved usage." Minn.Stat. § 645.08(1) (1990). The term "disability" was initially defined by the Human Rights Act to mean "a mental or physical condition which constitutes a handicap." Minn.Stat. § 363.01, subd. 25 (Supp. 1973). While the low back anomalies in this case might be considered "physical conditions," they do not fall within the plain meaning of the term "handicap." *See American Heritage Dictionary* 591 (2d College ed. 1985) ("handicap" means "[a] disadvantage or deficiency, esp. a physical or mental disability that prevents or restricts normal achievement"). At this point, the claimants are generally asymptomatic, and cannot be considered disadvantaged, deficient, or otherwise restricted in normal achievement.

In 1983, the definition of "disability" was amended to include

> any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical or mental impairment which substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

1983 Minn. Laws ch. 276, § 1. Even if the low back anomalies at issue here can be considered "physical impairments," which is questionable, they certainly do not "substantially limit" a major life activity. Nor can it be concluded that Hibbing Taconite

regarded the claimants in this case as having such an impairment.

The supreme court has recently rejected an expansive interpretation of this current definition of "disability." In *State by Cooper v. Hennepin County,* 441 N.W.2d 106, 108 (Minn.1989), the county rejected an individual for employment as a detention deputy based on a pre-employment physical examination that disclosed he had uncorrected vision in excess of 20/100 in both eyes and high tone hearing loss in one ear. An ALJ granted the county's motion for summary judgment on the ground that the individual did not qualify as a "disabled person" under Minn.Stat. § 363.01, subd. 25a (Supp.1983). *Id.* at 107.

In affirming the ALJ's decision, the supreme court concluded the individual failed to meet the substantially limited standard because he had only been rejected for a single position with the county. *Id.* at 112. The court further concluded the individual was not regarded as having an impairment by the county. *Id.*

Similarly, the claimants in this case have not shown they are substantially limited merely because they have been rejected for employment as general laborers with Hibbing Taconite, a position that has been characterized as strenuous, heavy physical labor. The ALJ did not make any findings on this point, and its memorandum merely states: "At that time in northeastern Minnesota, not being able to perform work which required strenuous physical labor would have been a substantial limitation on each of the claimants." However, there is little or no evidence to support this statement.

In addition, it cannot be concluded that Hibbing Taconite regarded or perceived the claimants as being disabled. Hibbing Taconite's experts, the doctors from the Mesaba Clinic who performed the pre-employment physical examinations, both testified they did not consider the claimants in this case to be disabled, because all could still function normally. Hibbing Taconite determined these claimants should be disqualified from employment as general laborers *not* because they perceived the claimants

as being substantially limited in their ability to work, but because they determined it was not wise or prudent to expose these claimants to strenuous physical labor.

Further, the claimants were not perceived by the community as "disabled." One of the expressed purposes of the Human Rights Act is to "secure for persons in this state, freedom from discrimination." Minn.Stat. § 363.12, subd. 1 (1990). "Discrimination," in turn, suggests prejudice, bias, or the holding of unreasonable and preconceived judgments or convictions. *See American Heritage Dictionary* 404 and 977 (2d College ed. 1985). Thus, absent evidence of prejudice or bias, I do not believe the legislature intended to extend the protections of the Human Rights Act to these claimants, whose low back anomalies are detectable only by X-ray.

As such, I would also reverse the ALJ's determination that these claimants are disabled within the meaning of the Human Rights Act.