STATE of Minnesota, County of St. Louis, Respondent,

Kelleen Joy Nyman, n/k/a Kelleen Joy Lane, Respondent,

v.

Kevin James THOMAS, Appellant,

and

State of Minnesota, County of St. Louis, Respondent.

Kelleen Joy NYMAN, n/k/a Kelleen Joy Lane, Respondent,

v.

Todd William NYMAN, Respondent.

No. C5–98–109.

Court of Appeals of Minnesota.

Sept. 15, 1998.

Review Denied Nov. 17, 1998.

Alan L. Mitchell, St. Louis County Attorney, Lois A. Kuhlke, Assistant St. Louis County Attorney, Duluth, for respondent St. Louis County.

Peter C. Greenlee, Begeske Law Offices, Duluth, for respondent Kelleen Joy Nyman, n/k/a Kelleen Lane.

Michael S. Husby, Duluth, for appellant.

William R. Sweeney, Duluth, for respondent Todd William Nyman.

Considered and decided by SCHUMACHER, P.J., RANDALL and KALITOWSKI, JJ.

## OPINION

RANDALL, Judge.

Appellant argues that the district court erred when it adjudicated him to be the father of the minor child and argues that the court based its decision solely on the results of genetic blood testing. We affirm.

## FACTS

On January 21, 1992, C.S.N. was born during the marriage of respondent Kelleen Joy Lane (f/k/a Kelleen Joy Nyman) and respondent Todd William Nyman. Lane and

Nyman were married at the time, but later divorced in December 1996. During the dissolution proceedings, the paternity of C.S.N. was questioned and the issues of child support and paternity were reserved pending the results of genetic testing. The parties were granted joint legal custody of C.S.N. In the event that genetic blood testing eliminated Nyman as the biological father, the district court granted Nyman visitation "due to the close parent-child relationship existing between [C.S.N.] and [Nyman]."

Genetic blood testing samples of Lane, C.S.N., and Nyman were taken in November 1996. The results statistically excluded Nyman as the biological father. Later genetic blood testing conducted in March 1997, established a 99.99% probability that appellant Kevin James Thomas was the biological father of C.S.N.

On December 31, 1996 and August 30, 1997, both Thomas and Nyman were served with complaints to determine the paternity of C.S.N. The matters were consolidated, and on October 17, 1997, the district court adjudicated Thomas to be the father of C.S.N. On December 22, 1997, the district court amended its earlier order to find that there was no just reason for delay in the entry of judgment, adjudicating Thomas to be the father of C.S.N. The court also reserved the issues of Thomas's visitation rights, child support, medical support, childcare expenses related to work or education, and "lying-in" expenses.

## ISSUE

Did the district court err in adjudicating appellant to be the biological father of the minor child under the Minnesota Parentage Act?

## ANALYSIS

██ Because a paternity action is a civil action governed by the rules of civil procedure, summary judgment can be appropriate. *Johnson v. VanBlaricom,* 480 N.W.2d 138, 140 (Minn.App.1992). On appeal from summary judgment, this court asks (1) whether there are any genuine issues of material fact and (2) whether the lower court erred in its application of the law. *State by Cooper v.* *French,* 460 N.W.2d 2, 4 (Minn.1990). This court must view the evidence in the light most favorable to the party against whom judgment was granted. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). The interpretation of the Minnesota Parentage Act, Minn.Stat. §§ 257.51–.75 (1996), is a question of law that this court reviews de novo. *R.B. v. C.S.,* 536 N.W.2d 634, 637 (Minn.App.1995).

Here, oddly, the Parentage Act contains a presumption of paternity in favor of Nyman, who we know is not the father, along with a presumption of paternity of Thomas, who we know is the father of C.S.N. Nyman "is presumed" to be the father of C.S.N. because the child was born during his marriage to Lane and he received the child into his home and openly held her out to be his own. *See* Minn.Stat. § 257.55, subds. 1(a) (stating man is presumed to be biological father of child if child is born during his marriage to child's biological mother), (d) (man is presumed to be biological father if man receives child into his home and openly holds out child as his own). Thomas "is presumed" to be the father because genetic blood tests indicate a 99.99% likelihood that he is the biological father. *See* Minn.Stat. § 257.55, subd. 1(f) (a man is presumed to be biological father if genetic testing establishes statistical probability of man's paternity to be greater than 99%).

Thomas argues the district court *erred* in adjudicating him to be the father of C.S.N., even though genetic blood testing held him in at 99.99%. Thomas claims the district court erred by not adjudicating Nyman to be the father of C.S.N., even though genetic blood testing conclusively eliminated Nyman as the father. Thomas simply argues that he has not established in the past, nor has any intention of establishing in the future, a relationship with his child and, thus, he argues C.S.N.'s best interests lie in having the court adjudicate Nyman to be her father. We disagree.

██ The Parentage Act allows for the possibility of conflicting presumptions of paternity. *In re Welfare of C.M.G.,* 516 N.W.2d 555, 559 (Minn.App.1994); *see also* Minn.Stat. § 257.55, subd. 2 (providing reso-

424

lution of conflicting presumptions of paternity). The presumptions contained in the Parentage Act "are not conclusive of paternity, but rather create a functional set of rules that point to a likely father." *Id.* at 558. If two or more presumptions conflict, "the presumption which on the facts is founded on the weightier considerations of policy and logic controls." Minn.Stat. § 257.55, subd. 2; *see also C.M.G.,* 516 N.W.2d at 560 (quoting Minn.Stat. § 257.55, subd. 2). In *R.B.,* the court stated that

> even if the putative father were to present the court with blood tests establishing his paternity, those tests are given no greater weight than the other presumptions listed in [the Parentage Act].

*R.B.,* 536 N.W.2d at 637; *see also C.M.G.,* 516 N.W.2d at 560 (stating, "[w]here competing presumptions of paternity exist, the determination of paternity is no longer solely an issue of biological fact"). A child's best interests are to be considered in resolving conflicting presumptions of paternity. *In re Paternity of B.J.H.,* 573 N.W.2d 99, 102 (Minn.App.1998); *C.M.G.,* 516 N.W.2d at 560. When resolving such conflicting presumptions, Minnesota recognizes, along with other factors, the importance of not impairing blood relationships. *Kelly v. Cataldo,* 488 N.W.2d 822, 827 (Minn.App.1992), *review denied* (Minn. Sept. 15, 1992). The legislature has acknowledged the significance of blood relationships. *Id.* at n. 7. ("Concerns for marriage and blood relations are seen in the legislature's announcement of presumptive parental status.").

The importance of maintaining blood relationships was recognized in *B.J.H.* In that case, the mother had an affair with the respondent. *B.J.H.,* 573 N.W.2d at 101. Nearly a year later and while still married to her husband, she gave birth to a child. *Id.* Blood tests determined the respondent to be the biological father. *Id.* After the relationship between the mother and the respondent deteriorated to the point where she refused to allow him to see the child, the respondent sued to establish his paternity under the Minnesota Parentage Act. *Id.* The wife and her husband sought to have husband adjudicated the child's father under a best interest

analysis. *Id.* The district court, applying the best interest factors listed in Minn.Stat. § 518.17, subd. 1(a), along with other considerations, adjudicated the respondent to be the father. *Id.* This court noted that, among other things, the respondent wanted a relationship with the child; he was willing and financially able to support the child; the child was accepted by the respondent's family; the respondent no longer wanted a relationship with wife; the child will want to know the identity of his biological father; and even though the child spent the majority of his life with husband, because of his young age he was still able to develop a relationship with the respondent. *Id.* at 103. This court held that adjudicating the respondent to be the father of the child was consistent with the policy of not unnecessarily impairing blood relationships and was logically based on the facts. *Id.* at 103–04.

Thus, when choosing between two conflicting presumptions of paternity, in addition to considering the best interests of the child, district courts must weigh "historic policy considerations on the importance of protecting the marriage relationship and the importance of blood relationships." *Kelly,* 488 N.W.2d at 827.

Applying the best interests of the child standard, this is a difficult case. We conclude we are not in a position to find that the district court erred in its credibility determinations and its selection of Thomas to be the adjudicated father. Unlike *C.M.G.* or *B.J.H.,* this is not a case where the biological father (Thomas) is actively hoping to be adjudicated the father, finds himself competing for paternity rights with the "married father" who is still raising the child, is still married to the child's mother, and who is determined to preserve his marriage relationship and his family relationship against an outside interloper. When you have two men actively wanting to be involved in the life of a minor child, the best interests of the child will be served by a careful balancing of all the policy considerations (too numerous to mention) and the courts will have the luxury of looking at two men who want to be the father. These facts are exactly the opposite. Thomas, the biological father, is running away

from that designation and affirmatively disclaims any interest in the child, affirmatively disclaims any legal obligation to support the child, and wishes to shift that burden to another man. Nyman, although acknowledging a relationship with the child before he found out that he was not the father, now argues, with logic, that since he has been conclusively proved not to be the father, the obligation of support should not be his.

Here, the question of what is in the child's best interests is more vague, more subjective, than a situation where one or more men are fighting for the privilege of raising the child. Here there are none. While it appears that Nyman intends to maintain a relationship with C.S.N., he is not fighting to be adjudicated the father. Thomas, the biological father, is attempting to avoid the obligation to support C.S.N.

■ The district court concluded that Thomas should be the adjudicated father. We agree. Thomas cannot avoid the obligation to support his child by arguing that another man (Nyman) "will be a better father." "The obligation of all parents, men and women, to love and support their children begins at birth." *Korf v. Korf,* 553 N.W.2d 706, 710 (Minn.App.1996); *see also Jacobs v. Jacobs,* 309 N.W.2d 303, 305 (Minn. 1981) ("[A] parent's obligation to support his child commences with the child's birth.").

■ We cannot say that the district court erred in resolving the conflicting statutory presumptions of paternity in this case. Here, the marriage of Lane and Nyman was dissolved, thus the preservation of that family unit is of minimal consequence. The relationship between Nyman and C.S.N. was preserved by the district court wisely granting visitation rights to Nyman in the dissolution. As for Thomas, he does not challenge the 99.99% genetic blood testing holding him in as C.S.N.'s father. He simply does not want to be the adjudicated father. He claims that he has had little, if any, contact with C.S.N. since her birth. We can only note that C.S.N. is still young enough to develop a meaningful relationship with Thomas. Thomas can choose or not choose to involve himself in the life of his child. The choice is his. But he cannot "choose" to get out of his obligation to support C.S.N. simply by arguing that some other man should do it for him.

In light of the genetic blood tests establishing the likelihood of Thomas's paternity at 99.99 percent; the reality that Nyman will visit C.S.N. and interact with her about as much or as little as he chooses; and the conclusiveness of Nyman's exclusion as C.S.N.'s father, the adjudication of Thomas as the father of C.S.N. is consistent with the policy of not impairing blood relationships and, most importantly, is the only result, on these facts, that stands the test of reason and logic.

## DECISION

The district court properly resolved the competing presumptions of paternity in favor of Thomas. Its decision is consistent with the better considerations of policy and is logically based on the facts presented in this case.

**Affirmed.**