*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0487**

In re the Matter of: M. J. E. B., petitioner,
Respondent,

vs.

A. L. n/k/a A. T.,
Respondent,

E. G.,
Appellant,

C. L.,
Respondent Below,

Ramsey County, intervenor,
Respondent.

**Filed November 28, 2016
Affirmed
Hooten, Judge**

Ramsey County District Court
File No. 62-FA-13-3483

Karen A. Cooper, St. Paul, Minnesota (for respondent M.B.)

Lateesa T. Ward, Ward & Ward, P.C., Minneapolis, Minnesota (for appellant)

John Choi, Ramsey County Attorney, Sara Lauthen, Assistant County Attorney, St. Paul, Minnesota (for respondent county)

A. T., Oakdale, Minnesota (pro se respondent)

Considered and decided by Bratvold, Presiding Judge; Peterson, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

In this paternity action, appellant challenges the district court's amended order, which adjudicated petitioner-respondent biological father as the child's legal father. Appellant argues that the district court erred in concluding that the weightier considerations of policy and logic favor adjudication of the biological father as the child's father because the district court elevated the weight of genetic testing results over competing paternity presumptions and the child's best interests. We affirm.

**FACTS**

Respondent A.T. (the mother) gave birth to E.D.G. (the child) in January 2013. When the child was conceived, the mother was involved in romantic relationships with appellant E.G. and petitioner-respondent M.B. In the early stages of the mother's pregnancy, E.G. and M.B. each believed that he was the child's biological father. During this time, the mother was married to respondent C.L. The mother and E.G. signed a recognition of parentage ("ROP") in which they both acknowledged that they were the parents of the child. Even though the mother was still married to C.L. at the time of the child's birth, C.L. renounced that he was the child's father in the ROP.

The mother and E.G. remained in an intimate relationship, which allowed E.G. to have regular contact with the child. E.G. also paid court-ordered child support to the mother for the child's benefit. But, the mother also allowed M.B. to have contact with the

2

child on an intermittent basis with visits at various different locations, including visits at the homes of the mother and M.B's relatives, a church, a Burger King, a church camp, and a Walmart. These visits, however, eventually ended in January 2015. M.B. and E.G. each portrayed himself as the child's father in his community and each introduced the child to his own family members, who accepted the child as part of their family.

M.B. filed a paternity action against the mother in March 2014, seeking to establish himself as the child's legal father. The district court joined E.G., C.L., and Ramsey County as parties to the proceeding and directed the mother, the child, and M.B. to undergo genetic testing to determine whether M.B. was the child's biological father. The test results indicated a 99.99% probability that M.B. was the child's biological father. Due to the genetic testing results, the district court vacated the ROP and E.G.'s child support obligation.

M.B. and E.G., but not C.L., sought to be adjudicated as the child's father. C.L., who was divorced from the mother in March 2015 and had no relationship with the child, did not participate in the proceeding. The matter was set for a court trial, and the genetic test results were admitted into evidence.

In an order issued on September 9, 2015, the district court adjudicated M.B. as the father of the child. The district court found that (1) M.B. was the biological father; (2) M.B. desired a relationship with the child; (3) M.B. was willing and financially able to support the child; (4) M.B. introduced the child to his extended family, and his family accepted her; (5) the child would likely want to know the identity of her biological father; and (6) because of her young age, the child would be able to develop a relationship with M.B.

3

The district court indicated that it chose not to review and apply the best interests of the child factors, as set forth in Minnesota Statutes section 518.17, subdivision 1 (2014)[1], due to the child's young age and because the factors would favor E.G. only for having more access to the child.

E.G. moved the district court to amend its findings or, alternatively, set a new trial, arguing that the district court ignored relevant evidence, failed to consider the child's best interests, failed to properly evaluate M.B.'s testimony, and improperly weighed the genetic testing results over competing presumptions of paternity. The district court denied E.G.'s motion for a new trial but amended its findings to include an analysis of the best interests factors under section 518.17. The district court found that two of the factors favored E.G., specifically that the mother preferred that E.G. be named the child's legal father and that there was no evidence of E.G., unlike M.B., having any mental health or physical issues that might adversely affect his ability to parent the child or the child's well-being. The district court found that the remaining factors were either neutral or inapplicable to E.G. and M.B. Though the district court concluded that the best interests factors weighed slightly in favor of E.G., it determined that the considerations of policy and logic still supported adjudicating M.B. as the child's father. The district court noted that neither the

---

[1] The legislature revised the applicable statutory factors in between this case's court trial and the district court's initial order. 2015 Minn. Laws ch. 30, art. 1, § 3, at 271–73 (current version at Minn. Stat. § 518.17, subd. 1 (Supp. 2015)). The "law of the case" doctrine, which an appellate court must follow, generally yields to an intervening change of controlling law unless doing so would alter rights that have matured or have become unconditional. *McClelland v. McClelland*, 393 N.W.2d 224, 226–27 (Minn. App. 1986). Because neither party contends that the revised version of the statute must apply and due to the significant rights at stake, we apply the pre-August 1, 2015 version of the statute.

best interests factors favoring E.G. nor the biological connection between M.B. and the child were dispositive in its decision. The district court also emphasized its concern that adjudication of E.G. as the father could significantly limit M.B.'s ability to play a role in the child's life. E.G. appealed.

**D E C I S I O N**

E.G. argues that the district court erred in determining that the considerations of policy and logic weigh in favor of adjudicating M.B. as the child's father. The Minnesota Parentage Act (the Act) governs determinations of paternity by providing a variety of circumstances in which a man is legally presumed to be the father of a child. Minn. Stat. §§ 257.51–.85 (2014); *Turner v. Suggs*, 653 N.W.2d 458, 463 (Minn. App. 2002). A case that involves analyzing competing presumptions under the Act presents a question of law that we review de novo. *See In re Welfare of C.M.G.*, 516 N.W.2d 555, 558 (Minn. App. 1994). We will uphold the district court's findings of fact unless such findings are clearly erroneous. *In re Paternity of B.J.H.*, 573 N.W.2d 99, 103 (Minn. App. 1998). In a case where there are conflicting paternity presumptions, we will affirm the district court's paternity adjudication if the court's adjudication is based on the facts and supported by policy and logic. *See id.* at 103–04.

Under the Act, both M.B. and E.G. are presumed fathers of the child. M.B. is a presumptive father based on genetic testing that indicated a 99.99% likelihood that he is the child's biological father. *See* Minn. Stat. § 257.62, subd. 5(b) (2014). E.G. is presumed to be the father because (1) he and the mother signed and filed a ROP for the child, and (2)

he has openly held the child out as his own child. *See* Minn. Stat. § 257.55, subd. 1(d), (e) (Supp. 2015).

In a case in which there are multiple competing presumptions, the Act and relevant precedent provide us with direction on how to resolve an issue of paternity. The Act states that a presumption may be rebutted only by clear and convincing evidence. *Id.*, subd. 2 (2014). It is well established that one particular presumption does not automatically trump another. *B.J.H.*, 573 N.W.2d at 103. Rather, "[i]f two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." Minn. Stat. § 257.55, subd. 2. When weighing the considerations of policy and logic, we examine the particular facts of the case and take into account the child's blood relationships, the child's existing relationships, and the child's best interests pursuant to the factors in section 518.17. *B.J.H.*, 573 N.W.2d at 102–04; *C.M.G.*, 516 N.W.2d at 560–61; *Kelly v. Cataldo*, 488 N.W.2d 822, 827 (Minn. App. 1992), *review denied* (Minn. Sept. 15, 1992).

**The Child's Biological Relationships**

E.G. argues that the district court improperly elevated the weight of M.B.'s genetic testing results over the presumptions that favored adjudicating E.G. as the child's father. "[T]he determination of paternity is no longer solely an issue of biological fact." *C.M.G.*, 516 N.W.2d at 560. But, this court must acknowledge the importance of not impairing blood relationships. *State v. Thomas*, 584 N.W.2d 421, 424 (Minn. App. 1998), *review denied* (Minn. Nov. 17, 1998). Here, the district court stated that one of the considerations supporting M.B.'s adjudication as the child's father was the fact that he is her biological

6

father. But, the district court also noted twice that the fact that M.B. is the child's biological father was not dispositive in determining paternity in a case with competing presumptions. The district court also found that, based on the testimony at trial, it is likely that the child will want to know the identity of her biological father when she is older.

Despite E.G.'s assertions to the contrary, there is evidence that suggests M.B.'s relationship with the child would be severely impaired if he was not adjudicated as her father. M.B. testified that he was only permitted to visit with the child on a sporadic, inconsistent basis and only after the mother had given him permission. The mother testified that she intentionally limited M.B.'s contact with the child, even after she learned that M.B. was the child's biological father. Given these circumstances, the district court emphasized its concern that M.B.'s ability to play a role in the child's life would be significantly limited if E.G. was adjudicated as the father. However, the district court also found that if M.B. was adjudicated as the father, E.G. would still be involved in the child's life. This is supported by the fact that E.G. is engaged to the child's mother and they share a joint child. The district court appropriately balanced the significance of M.B.'s biological relation to the child without treating it as the determinative factor in deciding paternity.

**The Child's Existing Relationships**

E.G. next argues that the district court failed to carefully weigh the child's existing relationships or consider the fact that E.G. and the mother have a joint child together. Stability in maintaining a child's existing relationships is another consideration that the district court should examine in a case with competing paternity presumptions. *See B.J.H.*, 573 N.W.2d at 103 n.1. The district court recognized that E.G. and the mother are the

7

parents of a joint child born in August 2014. The district court also acknowledged that the mother is the biological mother of five other children, and that all but two of the children have different biological fathers. Some, but not all, of the mother's other children have parenting time with their biological fathers outside of the mother's home. The mother's household consists of a "blended" family in which many of the child's siblings do not share the same biological father. The child in this case is only three years old and she has an existing relationship with both presumed fathers. Under these circumstances, the district court did not err in determining that the child's environment would not be disrupted by adjudicating M.B. as the father.

**The Child's Best Interests**

E.G. also contends that the district court improperly analyzed and weighed the best interests factors against other considerations of policy and logic. "[A] child's best interests is a valid policy factor in resolving a conflict between competing paternity presumptions." *C.M.G.*, 516 N.W.2d at 560. In its amended order, the district court evaluated each best interests factor and determined that the factors, under the pre-August 1, 2015 version of section 518.17, weighed slightly in favor of E.G. The district court concluded that only two of the best interests factors favored E.G. over M.B., the rest being neutral or inapplicable.

E.G. argues that the district court erred in its application of the fourth factor: the intimacy of the relationship between each party and the child. *See* Minn. Stat. § 518.17, subd. 1(a)(4). Though the district court found that E.G. had more time and opportunity than M.B. to bond with the child, it decided that this factor did not favor either E.G. or

8

M.B. The district court found that there was ample evidence demonstrating E.G.'s love and affection for the child. But, the district court also found that M.B. had ongoing contact with the child, whenever the mother permitted it, and the evidence suggested that the child enjoyed M.B's company during his visits.

E.G.'s assertion that M.B. showed interest in the child only to rebuild his relationship with the mother is not consistent with the evidence. M.B. testified that he was willing to do anything to be in the child's life and that he wanted to be in her life fully, not only as a "weekend father." He also testified that the child would be his main focus. His testimony is supported by the fact that he enrolled in a parenting program through the Father's Resource Project and would be willing to participate in parenting classes. The evidence demonstrates that, while E.G. may be more bonded with the child due to his opportunity to have more contact with her, both M.B. and E.G. deeply care for the child, and thus it was not clearly erroneous for the district court to find that this factor favored neither M.B. nor E.G.

E.G. also argues that the record does not support the district court's finding that the desired maintenance of continuity for the child was a neutral factor, noting that M.B. has been homeless, has moved several times, and has a spotty employment record. The district court found, however, that M.B. is presently employed and, like E.G., lives in in his own apartment. There was no evidence presented that either apartment of M.B. or E.G. would be an inadequate place to exercise parenting time. M.B. also has the support of several family members who consider the child as part of their family. For these reasons, the

9

district court did not err in finding that this factor did not favor one presumed father over the other.

**M.B.'s Ability to Parent**

Finally, E.G. contends that the district court ignored relevant facts concerning M.B.'s ability to parent the child, including M.B.'s anger management issues and violent tendencies.[2] But, the district court acknowledged that M.B. had trouble controlling his emotions, referencing an August 2013 incident that occurred at a church camp attended by the mother and the child when M.B. lost his temper and caused some property damage. He was subsequently charged and pleaded guilty to misdemeanor criminal property damage. The district court noted, however, that M.B. has taken steps to address his anger issues, which include enrolling in the Father's Resource Project and expressing a willingness to participate in family therapy and counseling.

E.G. also argues that M.B.'s volatile temper would seriously impair M.B.'s ability to co-parent with the mother or communicate with E.G., who will likely play a role in the child's upbringing. The mother did testify that M.B. threatened to take the child away from her.[3] But M.B. testified, and the district court found, that he wanted to have a healthy co-parenting relationship with the mother. Although the evidence in the record suggests that M.B. and E.G. had some conflicts, including arguments on Facebook and a minor incident

---

[2] E.G. asserts that M.B. did not testify credibly regarding his efforts to address his anger and mental health issues. But, we defer to the district court's determinations on credibility. *B.J.H.*, 573 N.W.2d at 104.

[3] M.B. testified that he may have threatened to take the mother to court because of his limited and sporadic parenting time with the child.

10

involving M.B. visiting with one of the mother's other children, the district court determined that both presumed fathers understood that they needed to communicate effectively and cooperate in raising the child. It is evident that the district court did not ignore evidence of M.B.'s prior conduct or anger issues, but rather weighed this evidence in light of other policy considerations.

We recognize the difficulty in having to decide a child's paternity between two presumed fathers, both of whom are emotionally invested in the child and willing to care for the child. But we cannot conclude, based on this record, that the district court's findings are clearly erroneous or that the district court failed to properly weigh the child's best interests and considerations of policy and logic in adjudicating M.B. as the child's father.

**Affirmed.**